964 F.2d 116
 60 USLW 2746, 1992-1 Trade Cases P 69,834
 Fletcher J. JOHNSON, M.D. and Benjay Realty Corp.,
Plaintiffs-Appellants-Cross-Appellees,
v.
NYACK HOSPITAL, Kenneth Steinglass, M.D., Daniel Berson,
M.D., James Dawson and Rockland Thoracic
Associates, P.C.,
Defendants-Appellees-Cross-Appellants.
 Nos. 964, 1083, Dockets 91-7982, 91-9142.
 United States Court of Appeals,
Second Circuit.
 Argued Feb. 19, 1992.
Decided May 11, 1992.
 
 George R. Clark, Washington, D.C. (Jill M. Lashay, Reed Smith Shaw & McClay, Washington, D.C., and Sidney H. Stein, Stein, Zauderer, Ellenhorn, Frischer & Sharp, New York City, of counsel), for plaintiffs-appellants-cross-appellees.
 Jeffrey A. Mishkin (Francis D. Landrey, Lauren S. Albert, and Patricia J. Clarke, Proskauer Rose Goetz & Mendelsohn, New York City, of counsel), for defendants-appellees-cross-appellants.
 Before: VAN GRAAFEILAND, KEARSE and McLAUGHLIN, Circuit Judges.
 McLAUGHLIN, Circuit Judge:
 
 
 1
 Plaintiff ("Johnson") appeals from a judgment of the United States District Court for the Southern District of New York (Robert W. Sweet, Senior District Judge ), dismissing his complaint, with costs, for failure to exhaust administrative remedies. See Johnson v. Nyack Hosp., 773 F.Supp. 625 (S.D.N.Y.1991) ["Johnson I "]. Defendants cross-appeal from the district court's order denying their motion for attorney's fees. Id. For the reasons set forth below, we affirm the district court's decision.BACKGROUND
 
 
 2
 New York State law requires all hospitals in the state to periodically review the services they are rendering. N.Y.Pub.Health L. § 2805-j. As part of the review, each hospital must evaluate the "credentials, physical and mental capacity and competence in delivering health care services of all persons who are employed or associated with the hospital." Id. § 2805-j1(c). Federal law similarly requires hospitals receiving Medicaid or Medicare reimbursement to "ensure that there is an effective, hospital-wide quality assurance program to evaluate the provision of patient care." 42 C.F.R. § 482.21.
 
 
 3
 To comply with these mandates, in 1985, defendant Nyack Hospital ("Nyack") asked Dr. Kenneth Steinglass, who was Chief of Nyack's Thoracic and Vascular Surgery section, to review the performance of the twelve surgeons in the section. Steinglass analyzed the medical records of the 222 operations performed by the section between December 1984 and June 1985. He used three criteria to evaluate the surgeons' performance: (1) medical judgment, (2) operative technique, and (3) documentation of procedure.
 
 
 4
 Steinglass spotted a number of inadequacies. Curiously, plaintiff, Dr. Fletcher J. Johnson, accounted for seventy-five percent of them. Johnson's deficiencies ranged from unsatisfactory surgical procedure to insufficient documentation of his work. The risks that Johnson posed to patient care prompted Steinglass to recommend to defendant Dr. Daniel Berson, who was Nyack's Director of Surgery, that Nyack rescind Johnson's thoracic and vascular surgery privileges.
 
 
 5
 Berson passed this recommendation to defendant James Dawson, the president of Nyack. Because of the severity of Steinglass' conclusion, Berson and Dawson decided to get the counsel of independent experts in the fields of thoracic and vascular surgery. With the advice of the New York Regional Vascular Society and the New York Society for Thoracic Surgery, Dawson selected Dr. W. Graham Knox to reevaluate Johnson's vascular surgery cases, and Dr. E.F. Conklin to review Johnson's thoracic surgery cases. Neither Knox nor Conklin had ever taught, trained, or worked with either Steinglass or Johnson. Neither doctor was told about Steinglass' recommendations.
 
 
 6
 Conklin reviewed ten of Johnson's thoracic surgery cases, and concluded that (a) Johnson had improperly diagnosed and treated two patients; (b) Johnson removed a patient's lung without due regard for whether the patient would benefit; and (c) two of Johnson's patients required major surgery to treat conditions that Johnson had failed to correct. Ultimately, Conklin confirmed Steinglass' opinion that Johnson's surgical performance endangered patient welfare.
 
 
 7
 Knox found that Johnson's vascular operations reflected severe deficiencies in medical judgment and operative technique, and that Johnson had failed to properly document the care that he had provided. Like Conklin, Knox determined that Johnson posed a threat to patient welfare.
 
 
 8
 The independent judgments of Steinglass, Conklin, and Knox led Berson and Dawson to conclude that Johnson's surgical performance posed a peril to Nyack's patients. Under Nyack's by-laws (the "By-Laws"), however, neither Berson nor Dawson could revoke a physician's privileges. Rather, the By-Laws require Berson, as Director of Surgery, to advise Nyack's Credentials Committee of his recommendation to terminate a physician's privileges. The Credentials Committee then investigates the Director of Surgery's findings, and reports its conclusions to the Medical Executive Committee ("MEC"). The MEC next decides whether Nyack should revoke the physician's privileges.
 
 
 9
 Under the By-Laws, if the MEC decides to terminate a doctor's privileges, the physician receives a hearing before Nyack's Peer Review and Ethics Committee. If the Peer Review and Ethics Committee agrees with the MEC's decision, the physician may request a hearing before an independent hearing officer.
 
 
 10
 Following these procedures step-by-step, Berson recommended that the Credentials Committee revoke Johnson's privileges. The Credentials Committee unanimously did so on February 10, 1987, and passed the matter on to the MEC which, with one member opposed and one abstention, approved the revocation later that day. By a letter dated February 10, 1987, the MEC notified Johnson of its decision.
 
 
 11
 The Peer Review and Ethics Committee met fourteen days later to give Johnson an opportunity to refute the MEC's conclusion. At this meeting, the committee reviewed the Steinglass, Conklin, and Knox reports, and asked Johnson to rebut their evaluations. Johnson refused to address the charges head-on, but instead claimed that the MEC was motivated by racial bias and had based its decision on "incomplete" records.
 
 
 12
 Johnson's arguments did not persuade the Peer Review and Ethics Committee, which unanimously agreed with the MEC's decision. On July 22, 1987, the chairman of the MEC gave Johnson written notice of Nyack's final decision to terminate his privileges.
 
 
 13
 The next (and final) step in the procedure would be for the doctor to request the independent hearing to which the By-Laws entitle him. Johnson, however, made no such request and, instead, sought reinstatement of his privileges by commencing suit in New York State Supreme Court, Rockland County, against Nyack, Steinglass, Berson, Conklin, Knox, and each of the committees involved in the termination decision.
 
 
 14
 In his state complaint, Johnson alleged that the termination of his privileges was motivated by (1) Steinglass' "personal vendetta" against him; (2) Steinglass' racial prejudice; and (3) Steinglass' desire to monopolize the thoracic-vascular practice in the Nyack area. The state court dismissed the complaint, holding that Johnson had failed to exhaust his administrative remedies because (a) he had not requested review before an independent hearing officer pursuant to the By-Laws, and (b) he had ignored the mandate of N.Y.Pub.Health L. § 2801-b that a physician aggrieved by a hospital's termination of privileges file a complaint with the New York Public Health Council before seeking relief in the courts.
 
 
 15
 Backtracking, Johnson then requested the independent review under the By-Laws. Nyack appointed Dr. Julius H. Jacobson, a practicing vascular and thoracic surgeon, to serve as the hearing officer. Claiming that Jacobson had some "prior contacts" with the case, Johnson objected to Nyack's selection of Jacobson. Johnson, however, did not elaborate on his allegations, and the hearing proceeded on December 17, 1987.
 
 
 16
 Steinglass, Conklin, and Knox testified at the hearing, furnishing detailed descriptions of Johnson's inadequacies. Johnson had the opportunity to cross-examine the doctors, to comment upon their reports, to present witnesses, and to testify on his own behalf. His own testimony did little to dispel the doctors' depictions of his incompetence: he was unable to describe, or even draw, the basic anatomy of several regions of the body on which he had operated. Jacobson's conclusion mirrored the grim recommendations of Steinglass, Conklin, and Knox--Nyack should immediately revoke Johnson's thoracic and vascular surgery privileges.
 
 
 17
 After receiving word of Jacobson's decision, Johnson wrote a letter to Nyack's Joint Conference Committee, in which he renewed his assertion that Jacobson was not impartial. He claimed that shortly after the MEC first voted to terminate his privileges in February 1987, he asked Jacobson to review his cases with an eye toward providing favorable expert testimony for him. Jacobson did, in fact, review the file, but he claimed to have no recollection of this when Nyack appointed him as hearing officer.
 
 
 18
 Because of the unusual circumstances, Nyack wisely decided to offer Johnson yet another hearing. However, Johnson rejected each of the hearing officers proposed by Nyack. The bases for his objections often bordered on the bizarre. Johnson rejected one candidate because he was born and reared in Texas, and thus, according to Johnson, could not impartially pass on whether Steinglass' evaluation was motivated by racial bias. Johnson rejected a second candidate because he and Steinglass had interned at the same hospital a year apart, and had "concurrently served their residency some three years thereafter." When Nyack proposed a third candidate, Johnson did not address his qualifications. Instead, Johnson's attorney advised Nyack that "the utter futility of the process" required Johnson "to turn to the only forum for redress."
 
 
 19
 Johnson then brought this federal suit against Nyack, Steinglass, Berson, Dawson, and Rockland Thoracic Associates, P.C., a professional corporation partly owned by Steinglass. Joining Johnson as a co-plaintiff was Benjay Realty Corp., which is a corporation wholly owned by Johnson.
 
 
 20
 In his complaint, Johnson claimed that the defendants conspired to revoke his surgical privileges because they wished to eliminate the competition he posed in the thoracic and vascular surgery market. Johnson further alleged that defendants desired to quash his plans to build a "medical mall" near Nyack that would provide out-patient treatment in various medical specialties. He claimed that defendants' actions violated federal antitrust laws, and also constituted tortious interference with economic advantage. Significantly, Johnson did not request reinstatement of his surgical privileges, but instead sought only damages and attorney's fees. Defendants moved for summary judgment dismissing the complaint, plus attorney's fees.
 
 
 21
 The district court granted defendants' motion for summary judgment, finding that because Johnson's claims were based on defendants' actions in terminating his privileges, he was obligated to exhaust his administrative remedies by filing a complaint with the New York Public Health Council prior to bringing suit in federal court. Because there was no diversity of citizenship between Johnson and all defendants, the court dismissed Johnson's tortious interference claim for lack of pendent[1] jurisdiction. Finally, the court found that Johnson's complaint was not "frivolous or entirely without foundation," and, therefore, denied defendants' motion for attorney's fees.
 
 
 22
 Johnson now appeals from the district court's decision granting summary judgment to defendants, who, in turn, cross-appeal from the district court's failure to award them attorney's fees. We find that the district court did not err in dismissing Johnson's complaint, and in denying defendants' motion for attorney's fees. Therefore, we affirm the decision of the district court.
 
 DISCUSSION
 I. Exhaustion of Administrative Remedies
 
 23
 We review de novo a district court's decision to grant summary judgment. E.g., Cargill, Inc. v. Charles Kowsky Resources, Inc., 949 F.2d 51, 55 (2d Cir.1991). A court will grant summary judgment if there is "no genuine issue as to any material fact," and if the moving party shows that it is "entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Of course, the court must resolve all ambiguities and draw all inferences against the moving party. Cargill, 949 F.2d at 55. These undisputed canons lead us to conclude that the district court properly granted summary judgment to defendants.
 
 
 24
 Under New York law, a hospital may terminate a physician's privileges only "for reasons limited to patient welfare, institutional objectives, and character or competency of the physician." Fried v. Straussman, 41 N.Y.2d 376, 377, 393 N.Y.S.2d 334, 335, 361 N.E.2d 984, 985 (1977). A physician who wants his privileges restored must first file a complaint with the New York Public Health Council ("PHC") prior to seeking redress in the courts. See Guibor v. Manhattan Eye, Ear and Throat Hosp., Inc., 46 N.Y.2d 736, 413 N.Y.S.2d 638, 386 N.E.2d 247 (1978). A primary function of the PHC is to determine whether there is a medical justification for the withdrawal of the doctor's privileges. Thus, a court must dismiss any suit brought by a physician seeking reinstatement of his privileges if the physician has not exhausted his remedies before the PHC.
 
 
 25
 In this case, however, Johnson does not seek reinstatement of his thoracic and vascular surgery privileges. Rather, he seeks only damages under the Sherman Act, 15 U.S.C. § 1, et seq. We have not yet had occasion to consider whether a physician who does not seek reinstatement at a hospital, but seeks damages only, must file a complaint with the PHC prior to asserting a federal claim for relief. The district courts within our circuit have differed on this issue. Compare Purgess v. Sharrock, No. 89 Civ. 8096, 1990 WL 104024 (S.D.N.Y.July 18, 1990) (physician must exhaust administrative remedies before suing hospital for damages on state or federal grounds) with Furlong v. Long Island College Hosp., 1984-1 Trade Cas. (CCH) p 65,994 (E.D.N.Y.1984) (physician need not exhaust administrative remedies before asserting antitrust damage claim against hospital that terminated her privileges).
 
 
 26
 New York state courts have addressed the problem. The state courts have allowed a physician to sue a hospital without first resorting to the PHC when the physician asserts claims of tortious interference with contract and defamation, Saha v. Record, 177 A.D.2d 763, 575 N.Y.S.2d 986 (3d Dept.1991), or claims of breach of contract, Giannelli v. St. Vincent's Hospital and Medical Center, 160 A.D.2d 227, 553 N.Y.S.2d 677 (1st Dept.1990). The common thread running through both cases is that the physician had a cognizable damage claim even though the hospital had a genuine medical reason for terminating the physician's privileges. Accordingly, the physician was not required to go first to the PHC for the obvious reason that his claim did not depend on whether the hospital legitimately terminated his privileges. On the other hand, if a legitimate medical reason for the termination is a complete defense to the physician's claim, the physician must first take his grievance to the PHC. Because the PHC has the peculiar expertise to assess whether a hospital had a sound medical reason for terminating a physician's privileges, see Guibor, 46 N.Y.2d at 738, 413 N.Y.S.2d at 639-40, 386 N.E.2d at 248, we conclude that a physician who asserts a damages claim that turns on whether the hospital legitimately terminated his privileges must first file a complaint with the PHC.
 
 
 27
 Whether defendants had a proper medical reason for terminating Johnson's surgical privileges will be dispositive of Johnson's antitrust claims. Defendants supervise providers of medical care. In this role, defendants may take whatever steps are necessary to ensure that patients receive quality treatment. This includes the revocation of privileges of a health care professional whose services are regarded as inadequate or incompetent. Although revocation of a doctor's privileges may, perforce, eliminate competition by decreasing the number of doctors in a given specialty, this alone will not give rise to an antitrust violation. Cf. Berkey Photo, Inc. v. Eastman Kodak Co., 603 F.2d 263 (2d Cir.1979) (company may protect its market position by normal competitive methods), cert. denied, 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980). Thus, Johnson cannot prevail on his antitrust claim if defendants had legitimate medical reasons to terminate his surgical privileges at Nyack.
 
 
 28
 The PHC is best qualified to determine in the first instance whether defendants had proper medical reasons for terminating Johnson's privileges. The PHC's mission is to "consider any matter relating to the preservation and improvement of public health." N.Y.Pub.Health L. § 225. The PHC customarily passes on cases where a doctor complains that a hospital unfairly terminated his privileges. In disposing of these cases, the PHC draws upon the vast medical knowledge of its members. Because of the PHC's experience and expertise, we agree with the district court that the PHC should first determine whether defendants' actions were medically justified.
 
 
 29
 While we affirm the district court's conclusion, we disavow the court's reliance on the doctrine of exhaustion to support its analysis. "Exhaustion" refers to those cases where "a claim is cognizable in the first instance by an administrative agency alone." United States v. Western Pac. R.R. Co., 352 U.S. 59, 63, 77 S.Ct. 161, 165, 1 L.Ed.2d 126 (1956) (emphasis added). In such cases, courts will not pass on the factual and legal issues in the case until completion of the administrative process. Id.
 
 
 30
 When jurisdiction is based on a federal question, we determine whether exhaustion is required by examining congressional intent. See Patsy v. Board of Regents, 457 U.S. 496, 501-02 & n. 4, 102 S.Ct. 2557, 2560-61 & n. 4, 73 L.Ed.2d 172 (1982). The legislative history of the Sherman Act contains no indication that Congress intended state administrative agencies to pass on whether a plaintiff has asserted a valid federal antitrust claim prior to consideration of the claim by a federal court. Indeed, federal courts have exclusive jurisdiction over federal antitrust lawsuits. See, e.g., Derish v. San Mateo-Burlingame Bd. of Realtors, 724 F.2d 1347, 1349 (9th Cir.1983). It would be anomalous if a statute as complex as the Sherman Act, which is subject to judicial interpretation solely by the federal courts, could also be interpreted by a state agency.
 
 
 31
 Although we agree that Johnson was required to file a complaint with the PHC before bringing a federal antitrust lawsuit, we do not believe that it is the exhaustion rule that commands this result. However, we may uphold a district court's grant of summary judgment on an alternative legal ground. See Alfaro Motors, Inc. v. Ward, 814 F.2d 883, 887 (2d Cir.1987). We conclude that the doctrine of primary jurisdiction, which is related to (and commonly confused with) exhaustion, is the applicable principle.
 
 
 32
 Primary jurisdiction "applies where a claim is originally cognizable in the courts, and comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body...." Western Pac. R.R., 352 U.S. at 64, 77 S.Ct. at 165. Primary jurisdiction thus recognizes that even though Congress has not empowered an agency to pass on the legal issues presented by a case raising issues of federal law, the agency's expertise may, nevertheless, prove helpful to the court in resolving difficult factual issues. See id. at 66, 77 S.Ct. at 166; see also Nader v. Allegheny Airlines, Inc., 426 U.S. 290, 304, 96 S.Ct. 1978, 1987, 48 L.Ed.2d 643 (1976).
 
 
 33
 Primary jurisdiction demands that Johnson resort to the PHC before seeking redress in federal court. The question whether defendants had a proper medical reason to terminate Johnson's privileges requires a skilled evaluation of whether Johnson provided inadequate treatment to Nyack's patients. This decision necessitates examination of various medical data concerning Johnson's cases. The medical expertise of the PHC will prove extremely helpful in sorting through these complex records, and resolving the factual questions at stake.
 
 
 34
 True it is that most primary jurisdiction cases involve questions of whether the district court should defer to a federal agency's determination of factual questions. See Goya Foods, Inc. v. Tropicana Products, Inc., 846 F.2d 848 (2d Cir.1988); General Electric Co. v. MV Nedlloyd, 817 F.2d 1022 (2d Cir.1987), cert. denied, 484 U.S. 1011, 108 S.Ct. 710, 98 L.Ed.2d 661 (1988). Nonetheless, our holding that the district court must wait for a state agency to resolve the complicated factual questions underlying Johnson's federal antitrust claim is not inconsistent with the rationale behind the primary jurisdiction doctrine. Primary jurisdiction allows an agency to pass on factual issues that require specialized, technical knowledge. Either a federal or state agency may have the requisite competence to serve this purpose. Because the PHC has the distinctive expertise to divine whether defendants had a legitimate medical reason for revoking Johnson's privileges, the PHC should make this determination before the district court considers the issue.
 
 
 35
 We also believe that judicial economy will be best served by requiring Johnson to file a complaint with the PHC before seeking judicial relief. The PHC often avoids the unpleasant task of besmirching a physician's reputation by:
 
 
 36
 using its professional expertise to identify and discourage groundless claims, to mediate and to conciliate disputes between health-care professionals, and to offer the court some aid in resolving such disputes, should the parties fail to come to agreement on their own.
 
 
 37
 Cohoes Memorial Hosp. v. Department of Health, 48 N.Y.2d 583, 589, 424 N.Y.S.2d 110, 113, 399 N.E.2d 1132, 1135 (1979). The PHC may yet propose a solution that will end the current hostilities between Johnson and Nyack without judicial intervention. At the very least, the PHC should be given a chance to try.
 
 II. Attorney's Fees
 
 38
 Defendants moved for attorney's fees pursuant to the Health Care Quality Improvement Act of 1986, codified at 42 U.S.C. § 11101, et seq., ("HCQIA"). Section 11113 of HCQIA provides:
 
 
 39
 In any suit brought against a defendant, to the extent that a defendant has met the standards set forth under section 11112(a) of this title and the defendant substantially prevails, the court shall, at the conclusion of the action, award to a substantially prevailing party defending against any such claim the cost of the suit attributable to such claim, including a reasonable attorney's fee, if the claim, or the claimant's conduct during the litigation of the claim, was frivolous, unreasonable, without foundation, or in bad faith.
 
 
 40
 42 U.S.C. § 11113.
 
 
 41
 In turn, section 11112(a) requires a hospital and its officials to review a physician's professional competency:
 
 
 42
 (1) in the reasonable belief that the action was in the furtherance of quality health care,
 
 
 43
 (2) after a reasonable effort to obtain the facts of the matter,
 
 
 44
 (3) after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances, and
 
 
 45
 (4) in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the requirement of paragraph (3).
 
 
 46
 42 U.S.C. § 11112(a). A hospital's review is presumed to have met these standards unless the physician rebuts the presumption by a preponderance of the evidence. Id.
 
 
 47
 The district court found that defendants had prevailed when their motions for summary judgment were granted, and that defendants had complied with Section 11112(a). Johnson I, 773 F.Supp. at 631. Neither party contests these findings. However, defendants claim that the district court erred in holding that Johnson's complaint was not "frivolous or entirely without foundation." Id. We disagree.
 
 
 48
 Whether a party's conduct is frivolous or without foundation is a question committed to the sound discretion of the district court. Accord Christiansburg Garment Co. v. EEOC, 434 U.S. 412, 421, 98 S.Ct. 694, 700, 54 L.Ed.2d 648 (1978) (district court has discretion to award attorney's fees to a prevailing defendant in a Title VII case if it finds that the plaintiff's actions were frivolous, unreasonable, or without foundation). Our examination of the undisputed facts gives us no reason to question the district court's finding that Johnson's complaint was neither frivolous nor without foundation. Johnson brought suit to obtain judicial review of defendants' decision to terminate the privileges that he had worked hard to obtain. We cannot characterize this action as frivolous or without foundation.
 
 
 49
 Although we hold today that Johnson erroneously brought suit against defendants before filing a complaint with the PHC, this mistake does not warrant the award of attorney's fees. As we have noted, the district courts in our circuit have been divided on the question whether a doctor aggrieved by termination of privileges must file a claim with the PHC before seeking redress in the courts. Johnson was certainly entitled to rely on the cases holding that prior resort to the PHC is unnecessary.
 
 
 50
 Finally, Johnson's conduct during the lawsuit was not so reprehensible as to require attorney's fees. The arguments advanced by Johnson during the district court proceedings simply amplified the allegations contained in his complaint. Our examination of the record fails to indicate that Johnson's deportment was so objectionable as to warrant attorney's fees. Accordingly, we hold that the district court did not abuse its discretion in denying defendants' motion for attorney's fees.
 
 CONCLUSION
 
 51
 The district court correctly dismissed Johnson's complaint without prejudice because he failed to file a complaint with the PHC prior to instituting a lawsuit in federal court. Furthermore, the district court did not abuse its discretion in denying defendant's motion for attorney's fees. Therefore, we affirm the decision of the district court.
 
 
 52
 AFFIRMED.
 
 
 
 [1]
 On December 1, 1990, Congress enacted the Judicial Improvements Act of 1990, Pub.L. No. 101-650, 104 Stat. 5113. Among other things, this law codified the former common-law doctrines of pendent jurisdiction and ancillary jurisdiction under the new rubric of "supplemental jurisdiction." See 28 U.S.C. § 1367. Because Johnson filed his complaint on February 2, 1990, the old common-law doctrine of pendent jurisdiction remained applicable. See Pub.L. No. 101-650, Title III, § 310(c)