296 F.3d 65
 Eugenio TASSY, Doctor, Plaintiff-Counter-Defendant-Appellant,
v.
BRUNSWICK HOSPITAL CENTER, INC., Morton Goldfarb, Medical Director, Defendants-Counter-Claimants-Appellees.
 Docket No. 01-7675.
 United States Court of Appeals, Second Circuit.
 Argued: February 12, 2002.
 Decided: July 8, 2002.
 
 Michael H. Sussman, Law Offices of Michael H. Sussman, Goshen, NY (Stephen Bergstein, on the brief), for Plaintiff-Counter-Defendant-Appellant.
 Robert J. Farley, Farley, Holohan, Glockner & Toto, LLP, Mineola, NY, for Defendants-Counter-Claimants-Appellees.
 Before: WALKER, Chief Judge, SACK, and B.D. PARKER, Circuit Judges.
 Chief Judge JOHN M. WALKER, JR. dissents in a separate opinion.
 B.D. PARKER, JR., Circuit Judge.
 
 
 1
 Plaintiff Dr. Eugenio Tassy, a psychiatrist, brought this action for damages and for reinstatement of his medical privileges at defendant Brunswick Hospital Center, Inc. ("Brunswick"). According to Tassy's complaint, Brunswick revoked his privileges following allegations of sexual harassment. Tassy, a black Haitian-American, denies the sexual harassment allegations and asserts that Brunswick discriminated against him on the basis of his race and national origin. Defendants moved to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), arguing that the doctrine of primary jurisdiction requires Tassy to pursue his claims with the New York Public Health Council (the "PHC") before suing in federal court. The District Court (Denis R. Hurley, Judge) granted the motion, dismissing Tassy's complaint without prejudice to refiling after review by the PHC (Hearing Transcript, May 4, 2001 ("Tr."), at 12), and Tassy appealed. Because we find the primary jurisdiction doctrine inapplicable, we vacate and remand.
 
 BACKGROUND
 
 2
 According to the allegations of the complaint, which we accept as true for purposes of this appeal, Tassy received privileges to practice medicine at Brunswick in 1994. In April 1998, Jovita Crasta, a psychiatrist at Brunswick, alleged that Tassy had sexually harassed her. In July 1998, a Brunswick employee alleged that Tassy had verbally abused her. In October 1998, another Brunswick doctor complained of improper behavior on the part of Tassy.[1] As a result of these allegations, Brunswick suspended Tassy's privileges. In November 1998, Brunswick reinstated Tassy's privileges in exchange for his agreement to submit to and pay for a psychiatric evaluation by the Medical Society of the State of New York's Committee for Physicians' Health. In March 1999, Crasta again accused Tassy of inappropriate behavior. Shortly after Crasta's second allegation, Brunswick suspended Tassy's privileges a second time. Tassy then requested a hearing. The parties scheduled and adjourned the hearing several times, but the hearing was never convened. In March 2000, Tassy requested that his privileges be reinstated. Brunswick never responded to this request, and Tassy remains suspended from practicing medicine at Brunswick. Tassy alleges that Brunswick and its medical director, defendant Dr. Morton Goldfarb, discriminated against him on account of his race and his national origin. In particular, Tassy alleges that Brunswick and Goldfarb have taken less draconian measures against white doctors accused of more serious misconduct.
 
 
 3
 Tassy filed his complaint in the Eastern District of New York on June 15, 2000, asserting claims for discrimination on the basis of race and national origin under 42 U.S.C. § 1981 and common law breach of contract. He seeks damages, reinstatement of his privileges, and other equitable remedies. Goldfarb answered and counterclaimed for breach of contract, alleging that Tassy had not paid the rent due on his office space. Tassy denied the allegations of the counterclaim. Brunswick then moved to dismiss under Federal Rule of Civil Procedure 12(b)(6) on the ground that Tassy was required to file a claim with the PHC before suing in federal court. The District Court, relying on the doctrine of primary jurisdiction and our decision in Johnson v. Nyack Hospital, 964 F.2d 116 (2d Cir.1992), dismissed the complaint without prejudice to its reinstatement after review by the PHC. (Tr. at 9, 12.) Tassy appealed.
 
 DISCUSSION
 
 4
 We review de novo a district court's dismissal pursuant to Rule 12(b)(6). Bernheim v. Litt, 79 F.3d 318, 321 (2d Cir. 1996). On a Rule 12(b)(6) motion to dismiss, we must construe the complaint in the light most favorable to the plaintiff, accepting all the allegations in the complaint as true. Chambers v. Time Warner, Inc., 282 F.3d 147, 152 (2d Cir.2002); Connolly v. McCall, 254 F.3d 36, 40 (2d Cir. 2001).
 
 
 5
 The sole issue on appeal is whether the doctrine of primary jurisdiction requires Tassy to file a complaint with the PHC before suing in federal court. To determine whether the doctrine applies, we first examine its origin and evolution.
 
 
 6
 Primary jurisdiction is a judge-made doctrine, created by Justice Edward White's opinion for a unanimous Supreme Court in Texas & Pacific Railway Co. v. Abilene Cotton Oil Co., 204 U.S. 426, 27 S.Ct. 350, 51 L.Ed. 553 (1907). See United States v. Radio Corp. of Am., 358 U.S. 334, 346, 79 S.Ct. 457, 3 L.Ed.2d 354 (1959); Louis L. Jaffe, Primary Jurisdiction, 77 Harv. L.Rev. 1037, 1042 (1964). In Abilene, the plaintiff oil company sued the defendant railroad in state court, alleging that it had charged unreasonable and discriminatory rates for interstate shipments of cotton seed. 204 U.S. at 430, 27 S.Ct. 350. The Supreme Court held that the plaintiff was required to pursue its claims with the Interstate Commerce Commission (the "ICC") in the first instance, id. at 448, 27 S.Ct. 350, and the doctrine of primary jurisdiction was born. The Supreme Court's decision in Abilene was motivated by the uniformity that would obtain if the ICC were permitted to resolve questions about the reasonableness of the rates that it had the responsibility to set and enforce:
 
 
 7
 For if, without previous action by the [ICC], power might be exerted by courts and juries generally to determine the reasonableness of an established rate, it would follow that unless all courts reached an identical conclusion a uniform standard of rates in the future would be impossible, as the standard would fluctuate and vary, dependent upon the divergent conclusions reached as to reasonableness by the various courts called upon to consider the subject as an original question.
 
 
 8
 Id. at 440, 27 S.Ct. 350. Following Abilene, early primary jurisdiction cases involved technical questions relating to regulated industries such as railroads, water and air transportation, electricity, and communications. See Robert B. von Mehren, The Antitrust Laws and Regulated Industries: The Doctrine of Primary Jurisdiction, 67 Harv. L.Rev. 929, 935-36 (1954).
 
 
 9
 Justice Brandeis identified a second rationale for the doctrine in Great Northern Railway Co. v. Merchants' Elevator Co., 259 U.S. 285, 42 S.Ct. 477, 66 L.Ed. 943 (1922), which involved a dispute over the tariff charged on interstate corn shipments. For the first time the Supreme Court cited administrative expertise, as well as uniformity, as a potential basis for invoking the doctrine:
 
 
 10
 [Resort to the ICC] is required because the enquiry is essentially one of fact and of discretion in technical matters; and uniformity can be secured only if its determination is left to the [ICC]. Moreover, that determination is reached ordinarily upon voluminous and conflicting evidence, for the adequate appreciation of which acquaintance with many intricate facts of transportation is indispensable, and such acquaintance is commonly to be found only in a body of experts.
 
 
 11
 Id. at 291, 42 S.Ct. 477. Although the Court declined to apply the primary jurisdiction doctrine in Great Northern Railway, the case signaled a shift in the predominant rationale that would support the doctrine's application in future cases. Several decades later the Supreme Court stated that, while "earlier cases" relied on "the desirable uniformity which would obtain if initially a specialized agency passed on certain types of administrative questions[,... m]ore recently the expert and specialized knowledge of the agencies involved has been particularly stressed." United States v. W. Pac. R.R. Co., 352 U.S. 59, 64, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956) (citations omitted).
 
 
 12
 While the doctrine has often been applied in cases involving difficult legal questions that must ultimately be resolved by the courts, the presence of such legal issues has not prevented the Supreme Court from concluding that primary jurisdiction lay in an administrative agency. In these cases, the Court has highlighted the separate roles of court and agency, as well as the importance of the primary jurisdiction doctrine in maintaining a proper balance between the two. In Far East Conference v. United States, 342 U.S. 570, 72 S.Ct. 492, 96 L.Ed. 576 (1952), for example, the Court held that primary jurisdiction lay in the United States Shipping Board, rather than in the federal courts, despite the questions of antitrust law involved in the case. The Far East Court defined the primary jurisdiction doctrine as:
 
 
 13
 a principle, now firmly established, that in cases raising issues of fact not within the conventional expertise of judges or cases requiring the exercise of administrative discretion, agencies created by Congress for regulating the subject matter should not be passed over. This is so even though the facts after they have been appraised by specialized competence serve as a premise for legal consequences to be judicially defined. Uniformity and consistency in the regulation of business entrusted to a particular agency are secured, and the limited functions of review by the judiciary are more rationally exercised, by preliminary resort for ascertaining and interpreting the circumstances underlying legal issues to agencies that are better equipped than courts by specialization, by insight gained through experience, and by more flexible procedure.
 
 
 14
 Id. at 574-75, 72 S.Ct. 492. The Supreme Court later reiterated this principle in discussing the role of the Federal Maritime Board in another antitrust case: "It is recognized that the courts, while retaining the final authority to expound the statute, should avail themselves of the aid implicit in the agency's superiority in gathering the relevant facts and in marshaling them into a meaningful pattern." Fed. Mar. Bd. v. Isbrandtsen Co., 356 U.S. 481, 498, 78 S.Ct. 851, 2 L.Ed.2d 926 (1958).
 
 
 15
 Since the inception of the doctrine, courts have resisted creating any fixed rules or formulas for its application. See W. Pac. R.R. Co., 352 U.S. at 64, 77 S.Ct. 161. Rather, "[i]n every case the question is whether the reasons for the existence of the doctrine are present and whether the purposes it serves will be aided by its application in the particular litigation." Id. As the origin and evolution of the primary jurisdiction doctrine demonstrate, the reasons for its existence and the purposes it serves are twofold: the desire for uniformity and the reliance on administrative expertise. See id. Thus, in determining whether to apply the primary jurisdiction doctrine, we must examine whether doing so would serve either of these purposes.[2]
 
 
 16
 With respect to the first purpose, Brunswick does not argue that applying the doctrine here would promote consistency and uniformity, and we do not see how it could. The concern for consistency and uniformity is more prevalent in cases involving issues of broad applicability such as the reasonableness of rates or tariffs. See Nat'l Communications Ass'n, Inc. v. Am. Tel. & Tel. Co., 46 F.3d 220, 224-25 (2d Cir.1995). United States v. Radio Corp. of America, 358 U.S. 334, 79 S.Ct. 457, 3 L.Ed.2d 354 (1959), for example, was an antitrust action arising out of an attempt by NBC, a subsidiary of Radio Corp. of America, to exchange the television station that it owned in Cleveland for one in Philadelphia. Id. at 335-36, 79 S.Ct. 457. In discussing the history of the primary jurisdiction doctrine, the Court noted that
 
 
 17
 this Court consistently held that when rates and practices relating thereto were challenged under the antitrust laws, the agencies had primary jurisdiction to consider the reasonableness of such rates and practices in the light of the many relevant factors including alleged antitrust violations, for otherwise sporadic action by federal courts would disrupt an agency's delicate regulatory scheme, and would throw existing rate structures out of balance.
 
 
 18
 Id. at 348, 79 S.Ct. 457. Because application of the primary jurisdiction doctrine would not promote uniformity, the Court declined to apply it: "Thus, there being no pervasive regulatory scheme, and no rate structures to throw out of balance, sporadic action by federal courts can work no mischief. The justification for primary jurisdiction accordingly disappears." Id. at 350, 79 S.Ct. 457.
 
 
 19
 Like Radio Corp., this case involves neither a regulatory scheme nor a rate structure. Because this case "presents a unique and narrow factual dispute that poses no risk of inconsistent interpretations" of any broadly applicable rule or policy, Am. Tel. & Tel., 46 F.3d at 225, the desire for uniformity does not support the application of the primary jurisdiction doctrine.
 
 
 20
 The more significant question is whether deferring to the PHC would promote "the resolution of technical questions of facts through the agency's specialized expertise." Golden Hill Paugussett Tribe of Indians v. Weicker, 39 F.3d 51, 59 (2d Cir.1994). The PHC is a fifteen-member body within the New York State Department of Health, see N.Y. Pub. Health Law § 220 (McKinney 2001), whose duty is to "consider any matter relating to the preservation and improvement of public health." N.Y. Pub. Health Law § 225(1) (McKinney 2001). "A primary function of the PHC is to determine whether there is a medical justification for the withdrawal of [a] doctor's privileges." Johnson, 964 F.2d at 121.
 
 
 21
 Tassy argues that there are no technical questions for the PHC to review, as Brunswick suspended his privileges because of his alleged sexual harassment, his race, and his national origin, all of which are non-medical issues that are unrelated to the PHC's expertise. In response, Brunswick relies on New York Public Health Law section 2801-b(1), which states that a hospital may suspend a physician's privileges only because of "standards of patient care, patient welfare, the objectives of the institution or the character or competency of the applicant[,]" and section 2801-b(2), which states that any person claiming to be aggrieved by a violation of section 2801-b(1) may file a complaint with the PHC. The gravamen of Brunswick's argument is that it suspended Tassy's privileges on the basis of his character and, because section 2801-b(1) lists character as a permissible basis for suspension and section 2801-b(2) authorizes the PHC to redress violations of section 2801-b(1), the PHC has the expertise to determine whether Tassy's character rendered him unfit to practice medicine.
 
 
 22
 In support of its argument that we should apply the primary jurisdiction doctrine, Brunswick places substantial reliance on Johnson, in which we held that the doctrine required the plaintiff physician to pursue his claims arising out of the termination of his hospital privileges before the PHC. As a brief discussion of Johnson demonstrates, however, that case is distinguishable. The plaintiff in Johnson was a thoracic and vascular surgeon whose hospital privileges had been revoked after the hospital determined that "Johnson's surgical performance posed a peril to Nyack's patients." Id. at 118. A hospital investigation concluded that he had employed unsatisfactory surgical procedures and had insufficiently documented his work. Id. Placing particular emphasis on the relevant expertise of the PHC, we concluded:
 
 
 23
 Primary jurisdiction demands that Johnson resort to the PHC before seeking redress in federal court. The question whether defendants had a proper medical reason to terminate Johnson's privileges requires a skilled evaluation of whether Johnson provided inadequate treatment to Nyack's patients. This decision necessitates examination of various medical data concerning Johnson's cases. The medical expertise of the PHC will prove extremely helpful in sorting through these complex records, and resolving the factual questions at stake.
 
 
 24
 Id. at 122.
 
 
 25
 In stark contrast to Johnson, this case does not involve allegations of technical incompetence or inadequate patient care, does not implicate any medical data or complex records, and would not benefit from the medical expertise of the PHC. The primary factual issue is whether Tassy committed the alleged sexual harassment, the resolution of which does not require the PHC's expertise. See id. at 122 (noting that primary jurisdiction applies where an "agency's expertise may... prove helpful to the court in resolving difficult factual issues") (emphasis in original). The PHC has no expertise in determining whether a doctor committed sexual harassment or other acts of non-medical misconduct. Nor is medical expertise necessary to determine that one who sexually harasses his colleagues is lacking in character. We deem it significant that, according to Tassy's allegations, Brunswick has not made any charges regarding Tassy's treatment of his patients or his competence as a physician, and Brunswick did not review any patient charts or medical data in deciding to suspend Tassy's privileges. In short, Brunswick's decision to suspend Tassy's privileges does not invoke the particular expertise of the PHC. While there may well be cases in which issues surrounding a physician's character fall within the PHC's expertise, this is not such a case. Because the issues involved here "are neither beyond the conventional expertise of judges nor within the special competence of" the PHC, the primary jurisdiction doctrine does not apply. See Fulton Cogeneration Assocs. v. Niagara Mohawk Power Corp., 84 F.3d 91, 97 (2d Cir.1996).[3]
 
 
 26
 Brunswick argues that Johnson stands for the proposition that any physician challenging the termination of privileges on any basis must file a complaint with the PHC before suing in federal court. Johnson did not establish such a broad rule; rather, the Court merely found that the PHC's medical expertise would be of assistance: "Because the PHC has the peculiar expertise to assess whether a hospital had a sound medical reason for terminating a physician's privileges, we conclude that a physician who asserts a damages claim that turns on whether the hospital legitimately terminated his privileges must first file a complaint with the PHC." Johnson, 964 F.2d at 121 (internal citation omitted). Unlike the defendant in Johnson, Brunswick does not assert that it had a medical reason for suspending Tassy's privileges, and the PHC does not have the "peculiar expertise" to assess whether Tassy committed sexual harassment.
 
 
 27
 The Supreme Court's decision in Nader v. Allegheny Airlines, Inc., 426 U.S. 290, 96 S.Ct. 1978, 48 L.Ed.2d 643 (1976), is particularly apt. The plaintiff in Nader had brought a common law fraudulent misrepresentation claim based on the defendant airline's policy of overbooking its flights. Declining to apply the primary jurisdiction doctrine, the Court held:
 
 
 28
 Referral of the misrepresentation issue to the [Civil Aeronautics] Board cannot be justified by the interest in informing the court's ultimate decision with "the expert and specialized knowledge" of the Board. The action brought by petitioner does not turn on a determination of the reasonableness of a challenged practice[,] a determination that could be facilitated by an informed evaluation of the economics or technology of the regulated industry. The standards to be applied in an action for fraudulent misrepresentation are within the conventional competence of the courts, and the judgment of a technically expert body is not likely to be helpful in the application of these standards to the facts of this case.
 
 
 29
 Id. at 305-06, 96 S.Ct. 1978 (internal citation and footnote omitted). The same is true here. We fail to see how the PHC's medical expertise would aid the determination of whether Tassy committed the sexual harassment that has been alleged.
 
 
 30
 Nor are we convinced that the inclusion of "character" in section 2801-b(1) as a permissible basis for suspending privileges requires that we defer to the PHC on all issues relating to character. In applying the primary jurisdiction doctrine, the District Court seems to have found dispositive the fact that character is a permissible basis for suspension under section 2801-b(1):
 
 
 31
 It may be that in enacting 2801-b and not limiting the Public Health Council's review powers to purely instances of medical incompetence, the [New York] legislature felt that character flaws may have to be factored into the determination by a hospital as to whether the individual involved should continue to dispense medical services at the facility. That may be debatable, but the legislation is clear. Why they did it may be debatable.
 
 
 32
 (Tr. at 10.) The fact that the New York legislature permits hospitals to revoke privileges based on character flaws, however, does not mean that the PHC has expertise in determining whether a particular physician's character is flawed. Indeed, the District Court did not find that the PHC's expertise would be useful in resolving any factual dispute. To the contrary, the District Court found, "I think it is probably true that whether sexual harassment occurred certainly could be decided as well by this Court as [by] the Public Health Council." (Tr. at 10.)
 
 
 33
 We emphasize that primary jurisdiction is a discretionary doctrine whose applicability in any given case depends on "whether the reasons for the existence of the doctrine are present and whether the purposes it serves will be aided by its application in the particular litigation." W. Pac. R.R. Co., 352 U.S. at 64, 77 S.Ct. 161.[4] The doctrine cannot be applied mechanically. In finding that the inclusion of "character" in section 2801-b(1) required Tassy to proceed before the PHC in the first instance, the District Court seems to have incorrectly equated primary jurisdiction with the related — but distinct — doctrine of exhaustion of administrative remedies. The Supreme Court has explained the difference between these two doctrines:
 
 
 34
 "Exhaustion" applies where a claim is cognizable in the first instance by an administrative agency alone; judicial interference is withheld until the administrative process has run its course. "Primary jurisdiction," on the other hand, applies where a claim is originally cognizable in the courts, and comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body; in such a case the judicial process is suspended pending referral of such issues to the administrative body for its views.
 
 
 35
 Id. at 63-64, 77 S.Ct. 161.
 
 
 36
 In the primary jurisdiction context, whether an agency is statutorily authorized to resolve a particular issue is not itself determinative of whether to apply the doctrine. Rather, the pertinent questions are whether referral to the agency is necessary to promote uniformity and whether the agency's expertise would assist the court in resolving difficult factual issues. See Gen. Elec. Co. v. MV Nedlloyd, 817 F.2d 1022, 1027 (2d Cir.1987) (refusing to apply doctrine of primary jurisdiction because agency "experience is not needed to determine" the relevant issue); cf. Golden Hill Paugussett Tribe of Indians v. Weicker, 39 F.3d 51, 60 (2d Cir.1994) (applying primary jurisdiction doctrine because "[t]he [Bureau of Indian Affairs'] resolution of ... factual issues regarding tribal status will be of considerable assistance to the district court in ultimately deciding Golden Hill's Nonintercourse Act claims"); Danna v. Air France, 463 F.2d 407, 412 (2d Cir.1972) (applying primary jurisdiction doctrine to case involving reasonableness of airline fares because "the examination of these fare systems requires the exercise of an expertise more heavily concentrated in the Administrative and Executive branches than in the federal judiciary"). Rather than simply asking whether an administrative agency is statutorily authorized to hear a particular dispute, the primary jurisdiction doctrine asks whether an agency's review of the facts "will be a material aid" to the court ultimately charged with applying those facts to the law. Ricci v. Chi. Mercantile Exch., 409 U.S. 289, 305, 93 S.Ct. 573, 34 L.Ed.2d 525 (1973). Here, as the District Court itself noted, the PHC's review of the facts would not be a material aid to the court.
 
 CONCLUSION
 
 37
 Neither of the purposes of the primary jurisdiction doctrine would be served by applying the doctrine in this case: deferring to the PHC would not promote consistency or uniformity, and there are no questions of fact whose resolution would be aided by the PHC's expertise. Rather, the issues involved in this case are squarely "within the traditional realm of judicial competence." Goya Foods, Inc. v. Tropicana Prods., Inc., 846 F.2d 848, 851 (2d Cir.1988) (noting the "relatively narrow scope of the doctrine of primary jurisdiction"). Given "the virtually unflagging obligation of the federal courts to exercise the jurisdiction given them," Colo. River Water Conservation Dist. v. United States, 424 U.S. 800, 817, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976) (citations omitted), we decline to apply the primary jurisdiction doctrine. Accordingly, Tassy need not file a complaint with the PHC, and his claims may proceed in the District Court. For these reasons, we vacate the judgment of the District Court and remand for proceedings consistent with this opinion.
 
 
 
 Notes:
 
 
 [1]
 The complaint does not specify the nature of this allegation
 
 
 [2]
 The dissent argues that we should also consider a third purpose, judicial economy. Dissenting Opinion,infra, at 75. However, the Supreme Court has consistently held that there are only two purposes to consider in determining whether to apply the primary jurisdiction doctrine-uniformity and expertise. See W. Pac. R.R. Co., 352 U.S. at 64, 77 S.Ct. 161. Despite ample opportunity during the ninety-five years since it created the doctrine, see supra at 66-68, the Supreme Court has never identified judicial economy as a relevant factor. No doubt the reason is that considerations of judicial economy cannot assist a primary jurisdiction analysis, as it will always be more economical, from a judge's point of view, to dismiss a case or quickly refer it to an administrative agency, instead of adjudicating it himself. We are enjoined to resist this temptation because of "the virtually unflagging obligation of the federal courts to exercise the jurisdiction given them." Colo. River Water Conservation Dist. v. United States, 424 U.S. 800, 817, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976) (citations omitted).
 
 
 [3]
 The dissent argues that reliance on agency expertise favors dismissal. Dissenting Opinion,infra, at 73-75. The dissent relies on the fact that, because Tassy has brought a discrimination claim, the District Court will have to compare Brunswick's treatment of him to its treatment of similarly situated physicians of other races and national origins, a comparison that would be better made by the PHC. This argument, we suggest, suffers from two flaws. First, there is no reason to believe that the PHC would even be able to conduct the comparative analysis to which the dissent alludes. While New York Public Health Law § 2801-b(2) authorizes the PHC to determine whether Brunswick properly suspended Tassy's privileges under New York Public Health Law § 2801-b(1) (i.e., whether Brunswick suspended Tassy's privileges on the basis of his character), we are not aware of any statute or regulation that authorizes the PHC to determine whether Brunswick properly suspended Tassy's privileges under 42 U.S.C. § 1981 (i.e., whether Brunswick denied Tassy "the same right ... to make and enforce contracts ... as is enjoyed by white citizens"). Second, even if the PHC were able — and willing — to conduct this analysis, it still would not implicate the PHC's medical expertise. As the dissent points out, Tassy's § 1981 claim is based on his allegation that Brunswick has taken measures against him "which have not been taken against white doctors accused of much more serious indiscretions and much more significant misconduct." Dissenting Opinion, infra, at 74. For the reasons discussed in the text supra, an examination of "indiscretions" and "misconduct" directed at a co-worker does not implicate the PHC's medical expertise, regardless of who is alleged to have committed the indiscretions and misconduct.
 
 
 [4]
 The dissent's suggestion that the courts should "welcome the opportunity for ... pre-litigation dispute resolution in a case such as this," Dissenting Opinion,infra, at 75, we believe, misconceives the nature of the primary jurisdiction doctrine. While courts may often prefer that the parties engage in pre-litigation dispute resolution, we cannot require them to do so absent a sound legal basis. However "distasteful" or "counter-productive" a lawsuit may be, id., we cannot dismiss it pursuant to the doctrine of primary jurisdiction, and require the parties to litigate before an administrative agency, unless doing so would promote consistency and uniformity or unless the agency has some relevant expertise. As for the dissent's statement that parties often prefer an opportunity for pre-litigation dispute resolution before an administrative agency, id., nothing in our opinion precludes parties who choose to take advantage of such administrative procedures from doing so. Rather, we simply hold that, where a party prefers not to litigate before an administrative agency in the first instance, he cannot be forced to do so pursuant to the primary jurisdiction doctrine unless the purposes behind the existence of the doctrine are present.
 
 
 JOHN M. WALKER, JR., Chief Judge, dissenting:
 
 38
 Because I would affirm the district court's dismissal based on the doctrine of primary jurisdiction, I respectfully dissent.
 
 
 39
 The majority, faulting the district court for dismissing the complaint on the basis that the PHC has primary jurisdiction, cites two rationales for primary jurisdiction — consistency of rulings and agency expertise — and concludes that neither applies here. I agree that the first rationale does not apply, but believe that the second does. Moreover, a third reason not discussed by the majority, judicial economy, supports invocation of the doctrine.
 
 
 40
 At its core, Tassy's complaint is that the hospital has wrongly suspended his privileges and, accordingly, he seeks the reinstatement of his privileges as well as monetary damages. The hospital's authority to suspend Tassy's privileges is governed by N.Y. Pub. Health Law § 2801-b(1). Section 2802-b(2) provides that a person claiming that a suspension of his privileges was in violation of subsection (b)(1) may file a complaint with the PHC. Were Tassy to do so, as I think should be required, the PHC would have to decide whether "standards of patient care, patient welfare, the objectives of the institution or [Tassy's] character or competency" warranted suspension or reinstatement. See N.Y. Pub. Health Law § 2801-b(1). Tassy would argue, presumably, that they did not warrant suspension; that, because of discrimination, others similarly situated were not so disciplined; and that, given his medical expertise and record of performance relative to others, he should be reinstated. The hospital would have to defend these charges. All of this is squarely within the PHC's jurisdiction.
 
 
 41
 There are three likely outcomes of the proceedings before the PHC: (1) a determination in Tassy's favor; (2) a determination in the hospital's favor; and (3) a mediated settlement. Only in the event of outcome (2) would it be necessary for Tassy to proceed with his federal action. And, if that were to occur, the federal court would have the benefit of the answers to fact questions from the agency charged with disputes of this sort among professionals. Such answers would be of great assistance in resolving the federal claims that Tassy has presented in his complaint and in determining whether his privileges should be restored.
 
 
 42
 The majority disputes this point. It reasons that the PHC's medical expertise would not avail the court in this case because the "primary factual issue is whether Tassy committed the alleged sexual harassment, the resolution of which does not require the PHC's expertise." Maj. Op., supra, at 70. I do not think the factual inquiry invoked by Tassy's discrimination claims will be so limited.
 
 
 43
 Tassy claims that the harassment charges, even if true, were a pretext for the hospital's suspension of his privileges, which was in fact motivated by discriminatory animus. Central to this question, of course, is how the hospital disciplined other similarly situated doctors. In his complaint, Tassy alleges that appellees violated § 1981 and discriminated against him on the basis of his race and national origin by "act[ing] in a malicious manner, fostering baseless charges and taking draconian measures against plaintiff, a black Haitian, which have not been taken against white doctors accused of much more serious indiscretions and much more significant misconduct." (Emphasis added). Similarly, in his reply brief, Tassy states that his claim of racial discrimination is shown in part by the "frivolous nature of the charges against Dr. Tassy, his excellent job performance and the studied neglect of medical incompetence of Caucasians." (Emphasis added).
 
 
 44
 Thus, as is apparent from Tassy's own allegations of pretext, the factual issues in this case will go beyond whether Tassy harassed his co-workers. The factual issues will embrace the question whether, even if the hospital had a legitimate reason to suspend Tassy's privileges, the hospital has treated similarly situated physicians in the same way and whether the medical incompetence of other doctors was overlooked. More precisely, adjudication of Tassy's claims by this court will entail at least two inquiries that, given their fact-intensive character in the peculiar context of the practice of medicine, could be aided by the expertise of the state agency: (1) whether Tassy, a psychiatrist accused of abusive and harassing conduct, is similarly situated with other physicians who have different specialties, committed different acts of misconduct, or have different employment histories and characters; and (2) whether, in its employment decisions, the hospital has consistently applied the statutorily defined reasons for the suspension of privileges, which are "based on specialized medical considerations." See Gelbard v. Genesee Hosp., 87 N.Y.2d 691, 696, 642 N.Y.S.2d 178, 664 N.E.2d 1240, 1241 (1996).[1] For example, in determining whether Tassy's privileges were wrongfully suspended, the PHC would likely shed light on questions such as, for example, whether the hospital might have had a legitimate non-discriminatory reason to act more vigorously against accusations of abusive conduct by a psychiatrist, who counsels vulnerable individuals, than against a surgeon or pathologist.
 
 
 45
 Finally, the majority does not address judicial economy, a third factor that, in addition to consistency in rulings and technical expertise, supports invocation of the doctrine of primary jurisdiction. Although the Supreme Court has yet to rely on this factor, we have done so and, in this case, judicial economy militates in favor of invoking the doctrine. As we noted in a case involving the same state agency, "[w]e also believe that judicial economy will be best served by requiring [plaintiff] to file a complaint with the PHC before seeking judicial relief." Johnson v. Nyack Hosp., 964 F.2d 116, 123 (2d Cir.1992). Moreover, considerations of judicial economy overlap to a certain extent with those of agency expertise: the expertise of the PHC, particularly in the area of mediating disputes between health-care professionals, could prove helpful to the court in addition to promoting judicial economy. As we stated in Johnson, the "PHC may yet propose a solution that will end the current hostilities between [the parties] without judicial intervention. At the very least, the PHC should be given a chance to try." 964 F.2d at 123. The New York Court of Appeals has similarly "recognized the vital mediation role served by the PHC in providing a professionally competent forum in which to resolve disputes at any early state." Gelbard, 87 N.Y.2d at 697, 642 N.Y.S.2d 178, 664 N.E.2d at 1242 (citation and internal quotation marks omitted). One might think that the courts would welcome the opportunity for such pre-litigation dispute resolution in a case such as this.
 
 
 46
 I also think that in many cases the parties would as well. To be sure, it is essential that the courts should be available to hear serious and important claims, such as those raised by Tassy. However, it is also important to remember that a lawsuit frequently is a distasteful and needlessly counter-productive way to resolve a dispute. This is particularly so when the dispute is between professionals and involves questions of professional reputation, a professional's lifeblood. Under such circumstances, the proceeding before the PHC may "often avoid[] the unpleasant task of besmirching a physician's reputation by[] `using its professional expertise to identify and discourage groundless claims, [and] to mediate and to conciliate disputes between health-care professionals.'" Johnson, 964 F.2d at 123 (quoting Cohoes Mem'l Hosp. v. Dep't of Health, 48 N.Y.2d 583, 589, 424 N.Y.S.2d 110, 399 N.E.2d 1132, 1135 (1979)).
 
 
 47
 With respect, I dissent.
 
 
 
 Notes:
 
 
 [1]
 In making this point, I do not mean to suggest, as the majority states, Maj. Op.,supra, at 71 n. 3, that the PHC will analyze Tassy's § 1981 claim. Rather, my point is that the agency's investigation of whether Tassy's privileges were wrongfully suspended, which the PHC is authorized under New York law to perform, would produce factual determinations that would aid this court's analysis of Tassy's § 1981 claim in the ways described above. Given the inevitable overlap of Tassy's wrongful suspension and § 1981 claims, the PHC would consider many of the same factual, if not legal, issues as this court would. Nor is there any requirement that the same claims must be brought before both this court and the PHC. See Johnson v. Nyack Hosp., 964 F.2d 116 (2d Cir.1992) (affirming dismissal of plaintiff-physician's antitrust claims for plaintiff-physician's failure to file a complaint with the PHC first).