Neil ELLIS, Plaintiff–Appellee,

v.

**TRIBUNE TELEVISION CO.,**
**Defendant–Appellant.**

**Docket No. 05–1983–CV.**

United States Court of Appeals,
Second Circuit.

Argued: Dec. 19, 2005.

Decided: March 29, 2006.

Andrew D. Herman (Stanley M. Brand and Helen–Mary Bridget McGovern, on the brief), Brand Law Group, P.C., Washington, D.C., for Appellee.

Carter G. Phillips (R. Clark Wadlow, Richard D. Klingler, Jennifer Tatel, on the brief), Sidley Austin Brown & Wood, LLP, Washington, D.C. (Crane H. Kenney and Roger Goodspeed, Tribune Company, Chicago, Illinois; James T. Shearin and Andrew J. McDonald, Pullman & Comley, LLC, Bridgeport, Connecticut), for Appellant.

Daniel M. Armstrong, Associate General Counsel, Federal Communications Commission (Samuel L. Feder, Acting General Counsel, Jacob M. Lewis, Associate General Counsel, and C. Grey Pash, Jr., Counsel), Washington, D.C., for Amicus Curiae Federal Communications Commission.

Before: OAKES, SOTOMAYOR and WESLEY, Circuit Judges.

WESLEY, Circuit Judge.

Congress has delegated exclusive authority over broadcasting licensure matters to the Federal Communications Commission ("FCC" or "Commission"). That authority includes wide discretion in granting, revoking, conditioning, and extending licenses in furtherance of the public interest. This case arises in part because of the FCC's inordinate delay in exercising that authority. Tribune Television Company ("Tribune") currently owns a daily newspaper and two television stations in the Hartford, Connecticut area. Without an FCC waiver, Tribune is in violation of the FCC's newspaper/broadcast cross-ownership rule. Tribune previously received several temporary waivers and had applied for a permanent waiver, but, after the last temporary waiver had expired and while Tribune's application for the permanent waiver was pending, plaintiff Neil Ellis ("Ellis"), a Hartford-area resident, brought suit under 47 U.S.C. § 401(b). Ellis contends that, although the FCC granted Tribune a temporary waiver, the FCC nonetheless mandated Tribune's eventual compliance with the cross-ownership rule.

Although we are sympathetic to Ellis's frustration in the face of agency inaction, we believe that the district court—even assuming that it had the authority to enforce the FCC's previous orders under § 401(b)—acted prematurely in not allowing the FCC to decide Tribune's pending waiver request. The district court's deci-

sion involved a substantial danger of establishing inconsistent rulings (a danger that later became a reality) on an issue squarely within the agency's expertise and discretion. Consequently, we conclude that the district court erred in failing to dismiss or stay this action and to refer the matter to the FCC under the primary jurisdiction doctrine. We therefore VACATE the district court's judgment and REMAND the case with directions to dismiss.

## BACKGROUND

Tribune's licensing troubles result from its simultaneous ownership of one daily newspaper and two television stations in the same designated market area ("DMA"). Tribune owned one television station—WTIC–TV, Channel 61(FOX)—in Hartford, Connecticut, while managing another television station—WTXX–TV, Channel 20(UPN)—in Waterbury, Connecticut. Tribune managed WTXX pursuant to a "Management Services Agreement" with Counterpoint Communications Inc. ("Counterpoint"). On November 16, 1999, Tribune submitted an application to the FCC seeking to permit the transfer of Counterpoint-controlled Tiberius Broadcasting, Inc. ("Tiberius"), the licensee of WTXX, to Tribune. The transfer would result in Tribune simultaneously owning two televisions stations in the same DMA and would therefore bring Tribune in conflict with 47 C.F.R. § 73.3555(b)(2) (2002) (the "television duopoly rule"). The television duopoly rule permits the simultaneous ownership of two television stations in a DMA only under certain conditions specified by regulation.[1] Tribune's November

---

1. The district court, quoting the FCC, noted in its opinion:

> The television duopoly rule provides, in pertinent part, that the same entity may own or control two television stations in the same market so long as: (i) at the time the appli-

cation is filed, at least one of the stations is not ranked among the top four stations in audience rankings in the DMA; and (ii) at least 8 independently owned and operating full-power commercial and noncommercial educational television stations would re-

16 application sought a waiver of the television duopoly rule.[2]

While Tribune's application was pending, Tribune acquired the Times Mirror Company ("Times Mirror") on June 12, 2000. Times Mirror owned *The Hartford Courant,* and consequently, Tribune's acquisition of Times Mirror put Tribune in violation of a second FCC regulation, 47 C.F.R. § 73.3555(d) (2002) (the "newspaper/broadcast cross-ownership rule" · or "cross-ownership rule"). The newspaper/broadcast cross-ownership rule, which the FCC originally promulgated in 1975, *see In the Matter of Amendment of Sections 73.34, 73.240, and 73.636 of the Commission's Rules Relating to Multiple Ownership of Standard, FM, and Television Broad. Stations,* 50 F.C.C.2d 1046, 1975 WL 30457 (1975) (*"1975 Amendment"*), *recon. granted in part,* 53 F.C.C.2d 589, 1975 WL 30972 (1975), prohibits among other things the simultaneous ownership of a daily newspaper and a television station in the same DMA under most circumstances.[3] In this case, Tribune's simultaneous ownership of *The Hartford Courant* and WTXX violated the cross-ownership rule because WTXX's station signal "encompass[es] the entire community in which [the] newspaper is published." *Id.* § 73.3555(d)(3).

Tribune's common ownership of WTXX and *The Hartford Courant*—unlike its common ownership of WTIC and *The Hartford Courant*—required Tribune to comply immediately with the FCC's cross-ownership rule or to seek a waiver of that

---

main in the market after the proposed acquisition.
*Ellis v. Tribune TV Co.,* 363 F.Supp.2d 121, 124 (D.Conn.2005) (alterations omitted) (quoting *In re Application of Counterpoint Commc'ns, Inc. (Transferor) & Tribune Television Co. (Transferee),* 16 F.C.C.R. 15,044, 15,-044–45 ¶ 2, 2001 WL 876967 (2001)).

**2.** Tribune sought a waiver of the television duopoly rule because, although WTXX is not ranked among the top four stations in the Hartford–New Haven DMA, eight independently owned and operated television stations would not have remained in this DMA after Tribune's proposed acquisition. *See Ellis,* 363 F.Supp.2d at 124. Tribune requested a waiver from the television duopoly rule on the basis that WTXX met the FCC's criteria for a "failing" station, *id.*—a categorization that allows a licensee to continue to own a second station, *see Review of the Commission's Regulations Governing Television Broad.,* 14 F.C.C.R. 12,903, 12,935–40, 1999 WL 591820 (1999), *recon. granted in part,* 16 F.C.C.R. 1067, 2001 WL 46673 (2001).

**3.** The cross-ownership rule provides in relevant part that "[n]o license for a[] ... TV broadcast station shall be granted to any party (including all parties under common control) if such party directly or indirectly owns, operates or controls a daily newspaper and

the grant of such license will result in: ... (3) The Grade A contour of a TV station, computed in accordance with § 73.684, encompassing the entire community in which such newspaper is published." 47 C.F.R. § 73.3555(d)(3) (2002). As described below, in 2003, the FCC issued a revised cross-ownership rule that would have eliminated the cross-ownership rule under § 73.3555(d)(3). *See infra* note 6 and accompanying text. However, as also described below, the revised rule has not yet taken effect because the Third Circuit issued a stay in *Prometheus Radio Project v. FCC,* 373 F.3d 372, 382 (3d Cir. 2004), *cert. denied,* — U.S. ——, 125 S.Ct. 2902, 162 L.Ed.2d 310 (2005).

The dual rationale of the FCC's cross-ownership rule—a rationale later questioned in the FCC's revisions, *see Prometheus Radio Project,* 373 F.3d at 398—is in "promoting diversity of viewpoint and economic competition." *In the Matter of Newspaper/Radio Cross–Ownership Waiver Policy,* Notice of Inquiry, 11 F.C.C.R. 13,003, 13,004 ¶ 3, 1996 WL 557332 (1996); *cf.* 47 U.S.C. § 257(b) (delineating a "national policy" that "the Commission shall seek to promote the policies and purposes of this chapter favoring diversity of media voices, vigorous economic competition, technological advancement, and promotion of the public interest, convenience, and necessity").

rule. An existing television station licensee that acquires a daily newspaper in the same market may retain both the station and the newspaper until the end of the station's license terms. *See 1975 Amendment*, 50 F.C.C.2d at 1076 ¶ 103 n. 26. Thus, Tribune is able to retain *The Hartford Courant* and WTIC at least until April 1, 2007, the renewal date of WTIC's license. However, because Tribune did not own WTXX at the time it acquired *The Hartford Courant*, FCC regulations required Tribune to comply immediately with the cross-ownership rule as it applied to WTXX. As a result, on June 12, 2000, Tribune filed an amendment to its earlier, November 16 FCC application and requested a two-year waiver to comply with the cross-ownership rule.

In an Order dated August 3, 2001, the FCC granted Tribune's request to transfer control of Tiberius to Tribune, granted Tribune a permanent waiver from the television duopoly rule, and granted Tribune a six-month (rather than a two-year) waiver to comply with the cross-ownership rule. *See In re Application of Counterpoint Commc'ns, Inc. (Transferor) & Tribune Television Co. (Transferee)*, 16 F.C.C.R. 15,044, 15,048–49 ¶¶ 12–14, 2001 WL 876967 (2001) ("*2001 Order*"). The Commission, noting that Tribune's application was "unopposed," *id.* at 15044 ¶ 1, concluded that "granting Tribune · a temporary period to come into compliance with the television/newspaper cross-ownership rule is appropriate," *id.* at 15047 ¶ 9. The FCC believed that "[t]he temporary loss of diversity in the Hartford market during this period due to Tribune's common ownership of WTIC and WTXX and *The Hartford Courant* will be outweighed by the benefits of permitting an orderly sale of media properties to a qualified buyer that will preserve these stations as media voices in the market." *Id.* at 15048 ¶ 10. The FCC announced that it nevertheless "expect[ed]

Tribune to exercise its best efforts to sell the necessary assets to come into compliance with the rule." *Id.*

The FCC granted Tribune another six-month extension in an Order dated February 19, 2002. *See In re Application of Counterpoint Commc'ns, Inc. (Transferor) & Tribune Televison Co. (Transferee)*, 17 F.C.C.R. 3243, 3246 ¶ 11, 2002 WL 233150 (2002) ("*2002 Order*"). The FCC noted that Tribune had received no proposals for the purchase of WTXX within the previous six months, that Tribune had continued its investment in WTXX's physical plant and equipment, and that Tribune continued its efforts to sell the station. *Id.* at 3244 ¶¶ 5–7. Thus, the FCC concluded that Tribune had demonstrated that it had "exercised its best efforts to achieve compliance with the multiple ownership rules." *Id.* at 3245 ¶ 10. In according Tribune an additional six-month waiver, the Commission emphasized that it expected Tribune to "continue to exercise its best efforts and to expand its current efforts if needed to sell the necessary assets to come into compliance." *Id.* Accordingly, the FCC mandated that Tribune report the progress of those efforts to the Commission every forty-five days—a requirement with which Tribune has consistently complied. *Id.*

With the second six-month waiver period due to expire on August 19, 2002, Tribune submitted a timely fifty-page request, in which Tribune sought a permanent waiver or, in the alternative, another temporary waiver for a reasonable period of time. *See Application of Counterpoint Commc'ns & Tribune Television Co.*, File No. BTCCT—1999 1116AJW, Facility ID No. 14050, Request for Waiver (filed Aug. 2, 2002) ("permanent waiver request"). Tribune indicated that it had been unable to sell WTXX despite its best efforts, that the financial condition of WTXX had not improved significantly, and that, if

the FCC were to order Tribune to divest WTXX, the station could face the possibility of "going dark." Tribune further asserted that special circumstances warranted a permanent waiver of the cross-ownership rule: namely, Tribune's selling WTXX to an independent owner was infeasible, Tribune's continuing to own WTXX would not hinder competition or diversity, and Tribune's investing in WTXX would continue to improve the station's programming, facilities, and operations.

The August 19, 2002 deadline came and went without a Commission response to Tribune's permanent waiver request. Approximately nine months later, on May 9, 2003, Hartford-area resident Neil Ellis filed a complaint pursuant to 47 U.S.C. § 401(b) in the United States District Court for the District of Connecticut.[4] Ellis claimed that, since August 19, 2002, Tribune had been in violation of the FCC's 2001 Order. He asked the district court to enter an enforcement order declaring Tribune to be in violation of the 2001 Order, enjoining Tribune from further disobedience of that Order, and requiring Tribune to divest WTXX immediately in

order to comply with the cross-ownership rule. Ellis contended that he, as well as the general public, had been "injured by the lack of diversity and competition" within the Hartford–New Haven DMA and that this injury was a "direct result" of Tribune's disobedience of the 2001 Order. On May 30, 2003, Ellis moved for summary judgment.

While Ellis's summary judgment motion was pending, the Commission eliminated the cross-ownership rule and promulgated a new cross-ownership rule.[5] Under this revised cross-ownership rule, Tribune's simultaneous ownership of *The Hartford Courant*, WTXX, and WTIC would have been permissible even without a waiver. On July 3, 2003, Tribune moved to dismiss Ellis's complaint. Tribune argued that the declaratory and injunctive relief sought by Ellis was rendered moot by the FCC's issuance of the revised cross-ownership rule; that the factual and legal issues involved in this case were not ripe because the FCC had not yet acted upon Tribune's permanent waiver request; and that the primary jurisdiction doctrine required dismissal in light of the administrative proceedings pending before the FCC.[6]

---

**4.** Section 401(b) of Title 47 permits private individuals (as well as the FCC and Attorney General) to bring actions in federal district courts to enforce Commission orders that are not being obeyed. That provision states:

If any person fails or neglects to obey any order of the Commission other than for the payment of money, while the same is in effect, the Commission or any party injured thereby, or the United States, by its Attorney General, may apply to the appropriate district court of the United States for the enforcement of such order. If, after hearing, that court determines that the order was regularly made and duly served, and that the person is in disobedience of the same, the court shall enforce obedience to such order by a writ of injunction or other proper process, mandatory or otherwise, to restrain such person or the officers, agents, or representatives of such person, from fur-

ther disobedience of such order, or to enjoin upon it or them obedience to the same. 47 U.S.C. § 401(b).

**5.** *See In the Matter of 2002 Biennial Regulatory Review—Review of the Commission's Broad. Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecomms. Act of 1996, Cross–Ownership of Broad. Stations and Newspapers, Rules and Policies Concerning Multiple Ownership of Radio Broad. Stations in Local Markets, Definition of Radio Markets, Definition of Radio Markets for Areas Not Located in An Arbitron Survey Area,* 18 F.C.C.R. 13,620, 2003 WL 21511828 (2003) ("2002 Biennial Regulatory Review" or "revised cross-ownership rule").

**6.** In the interim, Tribune also made a formal inquiry with the Commission regarding the status of its permanent waiver request. On

While the Commission's promulgation of the revised cross-ownership rule might have been determinative, that rule never took effect. In *Prometheus Radio Project v. FCC*, 373 F.3d 372, 382 (3d Cir.2004), *cert. denied,* —— U.S. ——, 125 S.Ct. 2902, 162 L.Ed.2d 310 (2005), the Third Circuit stayed the FCC from implementing the revised cross-ownership rule and remanded the case to the FCC to justify or modify its approach. The Third Circuit concluded:

> Though we affirm much of the Commission's Order, we have identified several provisions in which the Commission falls short of its obligation to justify its decisions to retain, repeal, or modify its media ownership regulations with reasoned analysis. The Commission's derivation of new Cross–Media Limits, and its modification of the numerical limits on both television and radio station ownership in local markets, all have the same essential flaw: an unjustified assumption that media outlets of the same type make an equal contribution to diversity and competition in local markets. We thus remand for the Commission to justify or modify its approach to setting numerical limits.... The stay currently in effect will continue pending our review of the Commission's action on re-

mand, over which this panel retains jurisdiction.[7]

*Id.* at 435 (footnote omitted). On July 22, 2004, Tribune filed a motion with the Third Circuit requesting that the court reverse its decision to stay implementation of the revised cross-ownership rule. The Third Circuit denied that motion.

On March 21, 2005, the United States District Court for the District of Connecticut (Droney, J.) denied Tribune's motion to dismiss and granted Ellis's motion for summary judgment. *See Ellis v. Tribune TV Co.,* 363 F.Supp.2d 121 (D.Conn.2005). In rejecting Tribune's motion to dismiss, the district court found that the FCC's repeal of the cross-ownership rule, 47 C.F.R. § 73.3555(d)(3), did not render Ellis's action moot, *see Ellis,* 363 F.Supp.2d at 127–28; that Ellis's action was ripe for adjudication, *see id.* at 128–30; and that dismissal of Ellis's action under the doctrine of primary jurisdiction was not warranted, *see id.* at 130–32.

In analyzing Tribune's primary jurisdiction argument, the district court applied this Court's four-factor test, which examines (i) the area of the agency's expertise, (ii) the scope of the agency's discretion, (iii) the danger of inconsistent rulings, and (iv) the existence of prior applications to the agency. *See id.* at 130–31 (citations

September 5, 2003, approximately two months after Tribune's motion to dismiss, W. Kenneth Ferree, Chief of the FCC's Media Bureau, issued a letter ("2003 Letter") in response to Tribune's inquiry. The 2003 Letter stated that "we consider Tribune to be, and to have been, in full compliance with the Commission's multiple ownership rules and the Waiver."

7. While the government did not file a petition for a writ of certiorari, several private defendants filed their own petitions seeking certiorari. The Supreme Court, however, denied all of these petitions. *See Tribune Co. v. FCC,* —— U.S. ——, 125 S.Ct. 2903, 162 L.Ed.2d

310 (2005); *Sinclair Broad. Group, Inc. v. FCC,* —— U.S. ——, 125 S.Ct. 2903, 162 L.Ed.2d 310 (2005); *Nat'l Ass'n of Broadcasters v. FCC,* —— U.S. ——, 125 S.Ct. 2903, 162 L.Ed.2d 310 (2005); *Newspaper Ass'n of Am. v. FCC,* —— U.S. ——, 125 S.Ct. 2902, 162 L.Ed.2d 310 (2005); *Media Gen., Inc. v. FCC,* —— U.S. ——, 125 S.Ct. 2902, 162 L.Ed.2d 310 (2005); *see also FCC v. Prometheus Radio Project,* —— U.S. ——, 125 S.Ct. 2904, 162 L.Ed.2d 310 (2005) (denying government's conditional cross-petition for a writ of certiorari). On remand, the FCC has not yet acted "to justify or modify its approach" in response to the Third Circuit's instructions.

omitted). The district court found that "the FCC has never indicated that there was any ambiguity to its order, that further fact-finding is necessary or that there are any technical questions remaining in regards to Tribune's ownership of the various media outlets in Connecticut." *Id.* at 131. The court then found that the agency's discretion would be minimal because "the question presented in this case is straightforward: whether Tribune is in compliance with the 2001 Order" and "the FCC consistently has indicated that Tribune is in violation of its cross-ownership rules." *Id.* The district court also asserted that "there is no substantial danger of inconsistent rulings" because "this action is focused on the particular situation faced by Tribune in Connecticut" and the FCC's order is "limited to Tribune's situation." *Id.* Finally, the court noted that "Tribune clearly has made prior applications to the FCC." [8] *Id.*

Having rejected Tribune's motion to dismiss, the district court granted summary judgment for Ellis. The court concluded that Ellis had established every element necessary for enforcing an order under 47 U.S.C. § 401(b). The court found that "the 2001 Order constitutes a valid order for purposes of § 401(b)" because that Order makes clear that "Tribune's acquisition of WTXX violated the cross-ownership rule, and that the FCC was requiring Trib-

une to come into compliance with that rule." *Ellis,* 363 F.Supp.2d at 133–34. The court determined that the 2001 Order was "'regularly made and duly served' within the meaning of § 401(b)" because "Tribune participated in the proceedings leading up to that order, and Tribune undertook various follow-up measures to relieve itself from the burdens imposed by that order." *Id.* at 134. The district court also found that Tribune was in violation of the 2001 Order because the FCC's two six-month extensions were only "temporary waivers" and that Tribune was expected— but failed—to comply with the 2001 Order and cross-ownership rule. *Id.* Finally, the district court concluded that Ellis is an injured person under § 401(b) because "the FCC already ha[d] found that Tribune's ownership of WTXX, WTIC and the Hartford Courant would negatively affect diversity and competition within the Hartford media market—the exact injury alleged by Ellis." *Id.* at 136. The district court thus declared that Tribune was in violation of the 2001 and 2002 Orders and had been in violation of the FCC's cross-ownership rule, 47 C.F.R. § 73.3555(d)(3), since August 19, 2002. The court ordered Tribune to "forthwith come into compliance" with the cross-ownership rule as required by the 2001 and 2002 Orders. *Ellis,* 363 F.Supp.2d at 137. Tribune moved for a stay of the district court's judgment on April 4, 2005.

---

**8.** The district court also made three additional observations that it believed counseled against dismissing Ellis's action on the basis of primary jurisdiction. First, the court asserted that the statutory grant of enforcement power under 47 U.S.C. § 401(b) "would be eviscerated if district courts always had to defer to the jurisdiction of administrative agencies." *Ellis,* 363 F.Supp.2d at 131. Second, the court pointed out that, "although this case has been pending since 2003, at no time did the FCC make a motion to intervene or otherwise participate in this litigation, despite its ability to do so." *Id.* (citing, *inter alia,*

*Hawaiian Tel. Co. v. Pub. Utils. Comm'n of Hawaii,* 827 F.2d 1264, 1272 (9th Cir.1987) (noting that "the FCC can intervene or file amicus briefs in § 401(b) actions or even invoke the doctrine of primary jurisdiction")). Third, the court found that the FCC's 2003 Letter, in which the Chief of the FCC's Media Bureau asserted that Tribune was in full compliance with the cross-ownership rule and that Tribune's extension request remains "pending," did not provide a sufficient basis to dismiss Ellis's action on the basis of primary jurisdiction. *See id.* at 132 n. 11.

On April 13, 2005, while Tribune's motion was still pending, the FCC—following a delay of over two and one-half years—finally issued an Order in response to Tribune's 2002 permanent waiver request. *See In the Matter of Counterpoint Commc'ns, Inc. (Transferor) & Tribune Televison Co. (Transferee),* 20 F.C.C.R. 8582, 2005 WL 857000 (2005) ("*2005 Order*"). The FCC's 2005 Order rejected Tribune's request for a permanent waiver. *See id.* at 8550 ¶ 23. However, the Order extended Tribune's previously granted waiver until the date of the next renewal of the WTXX and WTIC licenses, thereby allowing Tribune to continue to own WTXX, WTIC, and *The Hartford Courant* until early 2007.[9] *See id.* at 8584 ¶ 4. The FCC found that "the public interest benefits that will result from Tribune's continued common ownership of WTXX through the Station's current license term outweigh any potential harm to the underlying goals of the newspaper-broadcast cross-ownership rule." *Id.* at 8588 ¶ 16. The Commission concluded that, in light of the "evidence concerning Tribune's efforts to sell WTXX," Tribune's "clear record of enhancing and expanding the Station's service to the public," and the "significant risk that requiring immediate divestiture would severely curtail that service or eliminate it altogether," granting a temporary extension to allow Tribune to continue its efforts to comply with the cross-ownership rule was warranted.[10] *Id.* at 8588–89 ¶¶ 16, 19.

On April 14, 2005, the district court held a hearing to examine the effect of the FCC's 2005 Order on Tribune's April 4, 2005 motion for a stay pending appeal. On April 19, 2005, the district court granted Tribune's motion. On the previous day, Tribune had moved for relief from judgment under Rule 60(b). *See* Fed.R.Civ.P. 60(b). That Rule 60(b) motion remains pending before the district court. On April 20, 2005, Tribune filed a notice of appeal with this Court.

Tribune, Ellis, and the FCC as amicus curiae raise a number of issues on appeal. The parties dispute whether § 401(b) provides a statutory basis for the district court's order; whether Tribune has in fact violated the FCC's 2001 Order; whether Ellis has standing under 47 U.S.C. § 401(b) and Article III; whether the district court should have referred this matter to the FCC under the primary jurisdiction doctrine; whether this action was ripe for review; and whether the FCC's 2005

---

**9.** On a number of occasions, the Commission has previously granted temporary and permanent waivers of the cross-ownership rule. *See In the Matter of the Applications of UTV of San Francisco, Inc., et al. (Assignors) & Fox Television Stations, Inc. (Assignee),* 16 F.C.C.R. 14,975, 2001 WL 838744 (2001) (twenty-four-month cross-ownership waiver); *In re Application of Chancellor Media/Shamrock Radio Licenses, LLC (Assignor) & Cox Radio, Inc. (Assignee),* 15 F.C.C.R. 17,053, 2000 WL 1159113 (2000) (twelve-month cross-ownership waiver); *In the Matter of Kortes Commc'ns, Inc. (Assignor) & Stafford Broad., LLC (Assignee),* 15 F.C.C.R. 11,846, 2000 WL 867615 (2000) (permanent cross-ownership waiver); *Columbia Montour Broad. Co., Inc. (Assignor) & Cmty. Commc'ns, Inc. (Assignee),* 13 F.C.C.R. 13,007, 1998 WL 306950 (1998) (permanent cross-ownership

waiver); *In re Applications of Capital Cities/ABC, Inc. (Transferor) & The Walt Disney Co. (Transferee),* 11 F.C.C.R. 5841, 1995 WL 871259 (1996) (twelve-month cross-ownership waiver); *In the Matter of Fox Television Stations Inc.,* 8 F.C.C.R. 5341, 1993 WL 757010 (1993) (permanent cross-ownership waiver); *In re Applications of Field Commc'ns Corp. (Assignee) & Kaiser Broad. Corp. (Assignor),* 65 F.C.C.2d 959, 1977 WL 38563 (1977) (permanent cross-ownership waiver).

**10.** On May 11, 2005, the Office of Communication of the United Church of Christ, Inc., filed a petition for reconsideration of the FCC's 2005 Order. Ellis did not participate in that petition, and the FCC has yet to issue a ruling.

Order rendered this action moot. For the reasons discussed below, we hold that the district court erred in failing to refer this case in the first instance to the FCC under the doctrine of primary jurisdiction; we therefore vacate the district court's judgment and remand this matter to the district court with directions to dismiss.

## DISCUSSION

### I. *Jurisdictional Prerequisites*

 Article III of the Constitution requires us to address the issues of standing, ripeness, and mootness. *See Poe v. Ullman,* 367 U.S. 497, 502–05, 81 S.Ct. 1752, 6 L.Ed.2d 989 (1961). We believe that the district court correctly concluded that Ellis's suit satisfied each of these constitutional prerequisites. First, Ellis established Article III standing because he is a Hartford-area resident who suffered an injury-in-fact—a less diverse and less competitive media environment—that was directly traceable to Tribune's common ownership of WTXX and *The Hartford Courant.* Second, Ellis's claim was ripe because, although Tribune had submitted a timely waiver extension request, the waiver period had ended on August 19, 2002, and the FCC failed to take any action (or give any official indication, until the 2005 Order, that it would take action) to either enforce or supercede its 2001 and 2002 Orders. Third, Tribune did not establish that Ellis's action was moot based on the FCC's revised cross-ownership rule (an argument that Tribune no longer presses on appeal) because, as noted above, the Third Circuit stayed the implementation of the revised rule.

On appeal, the FCC—on Tribune's behalf—does assert an alternative mootness argument based on the FCC's 2005 Order. Tribune has not waived this alternative theory even though it has not been decided below because "[t]he condition of mootness is not a defense that could be waived." *Lamar Adver. of Penn, LLC v. Town of Orchard Park,* 356 F.3d 365, 377 n. 16 (2d Cir.2004) (quoting *Fox v. Bd. of Trustees,* 42 F.3d 135, 140 (2d Cir.1994)). However, we decline to address Tribune's alternative mootness theory, not only (or even primarily) because Tribune's Rule 60(b) motion for relief from judgment is based on this argument and remains pending before the district court, but also because Tribune's mootness argument is intertwined with the merits of the primary jurisdiction issue.

Specifically, if the doctrine of primary jurisdiction required the district court to refer this matter to the FCC, then the FCC certainly would have had the authority to issue its 2005 Order (or a similar order at an earlier date). On the other hand, if the doctrine of primary jurisdiction did not require an FCC referral, then it is unclear (and the parties vigorously dispute) whether the FCC would have had the authority to issue the 2005 Order. *Cf. Town of Deerfield v. FCC,* 992 F.2d 420, 427–28 (2d Cir.1993) (holding that the FCC's policy of declining to become involved in a preemption controversy until after Article III court proceedings was unconstitutional because, in effect, such a policy would convert Article III decisions into mere advisory opinions). Here, because mootness and primary jurisdiction are intertwined under the unique circumstances of this case, and because the district court's primary jurisdiction determination occurred in 2003 while the FCC's Order could have only potentially rendered this matter moot in 2005, we deem it necessary to address first the issue of primary jurisdiction.[11]

---

11. We need not and do not, however, address the threshold statutory issues that arise under

## II. *Primary Jurisdiction*

■ The doctrine of primary jurisdiction is concerned with "promoting proper relationships between the courts and administrative agencies charged with particular regulatory duties." *United States v. W. Pac. R.R. Co.*, 352 U.S. 59, 63, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956). The doctrine's central aim is to allocate initial decision-making responsibility between courts and agencies and to ensure that they "do not work at cross-purposes." *Fulton Cogeneration Assocs. v. Niagara Mohawk Power Corp.*, 84 F.3d 91, 97 (2d Cir.1996). "Whether there should be judicial forbearance hinges therefore on the authority Congress delegated to the agency in the

legislative scheme." *Golden Hill Paugussett Tribe of Indians v. Weicker*, 39 F.3d 51, 59 (2d Cir.1994) (citing *Ricci v. Chicago Mercantile Exch.*, 409 U.S. 289, 304, 93 S.Ct. 573, 34 L.Ed.2d 525 (1973)); *see also Gen. Elec. Co. v. MV Nedlloyd*, 817 F.2d 1022, 1026 (2d Cir.1987) (noting that the doctrine applies "when Congress has entrusted the regulation of certain subject matter under a statute to an administrative agency"). Recourse to the doctrine of primary jurisdiction is thus appropriate "whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body." [12] *W. Pac. R.R. Co.*, 352 U.S. at 64, 77 S.Ct. 161.

47 U.S.C. § 401(b): for example, whether the district court had a statutory basis not only to "enforce" an FCC order but to order divestiture under § 401(b) and whether Ellis had standing under § 401(b) as a "party injured." We have acknowledged that "whether a disputed matter concerns jurisdiction or the merits (or occasionally both) is sometimes a close question." *Da Silva v. Kinsho Int'l Corp.*, 229 F.3d 358, 361 (2d Cir.2000). The Supreme Court has instructed us, however, that "when Congress does not rank a statutory limitation on coverage as jurisdictional, courts should treat the restriction as nonjurisdictional in character." *Arbaugh v. Y & H Corp.*, — U.S. —, 126 S.Ct. 1235, 1245, 163 L.Ed.2d 1097 (2006). Here, 47 U.S.C. § 401(a) applies by title to the "Jurisdiction" of the enforcement provisions while § 401(b) applies by title to the "Orders of Commission." Applying the Supreme Court's "readily administrable bright line to this case," *Arbaugh*, 126 S.Ct. at 1245, we conclude that we need not address the statutory issues arising under § 401(b) before addressing the issue of primary jurisdiction. *Cf. Alberta Gas Chems., Ltd. v. Celanese Corp.*, 650 F.2d 9, 10, 11–12 (2d Cir.1981) (remanding to the district court for referral to the agency on the basis of primary jurisdiction while concluding that "we do not find it necessary or appropriate to reach" most of the legal issues including appellee's statutory argument even though it was "one of the alternate grounds" on which the district court relied).

**12.** The doctrine originated in *Texas & Pacific Railway Co. v. Abilene Cotton Oil Co.*, 204 U.S. 426, 27 S.Ct. 350, 51 L.Ed. 553 (1907), in which then-Justice Edward White used the phrase "prior action by the Commission." *Id.* at 440, 27 S.Ct. 350; *cf. Great N. Ry. Co. v. Merchants' Elevator Co.*, 259 U.S. 285, 290–91, 42 S.Ct. 477, 66 L.Ed. 943 (1922) (describing the doctrine as "preliminary resort to the Commission"). Subsequently, courts adopted the label "primary jurisdiction," but this nomenclature is potentially misleading:

> The use of the word "jurisdiction" has led to considerable confusion as to whether, before administrative action, the courts have any jurisdiction at all. This could have been avoided if Judge Augustus Hand's more felicitous phrase—"prior resort"—had been generally adopted. Judge Hand's phrasing recognizes that the courts have jurisdiction over the subject matter of the action and that the only question is whether they should exercise their jurisdiction initially or require "prior resort" to the appropriate agency.

Robert B. von Mehren, *The Antitrust Laws and Regulated Industries: The Doctrine of Primary Jurisdiction*, 67 HARV. L. REV. 929, 932 (1954) (footnote omitted) (citing *United States Nav. Co. v. Cunard S.S. Co.*, 50 F.2d 83, 87 (2d Cir.1931) (Hand, J.)); *cf. MFS Sec. Corp. v. New York Stock Exch.*, 277 F.3d 613, 621–22 (2d Cir.2002) (noting that the doctrine's label is "singularly infelicitous" be-

■ The rationale behind the doctrine includes a concern for maintaining uniformity in the regulation of an area entrusted to a federal agency, *see Texas & Pac. Ry. Co. v. Abilene Cotton Oil Co.*, 204 U.S. 426, 440, 27 S.Ct. 350, 51 L.Ed. 553 (1907), as well as a desire for utilizing administrative expertise, *see Great N. Ry. Co. v. Merchants' Elevator Co.*, 259 U.S. 285, 291, 42 S.Ct. 477, 66 L.Ed. 943 (1922). As the Supreme Court has stated:

> Uniformity and consistency in the regulation of business entrusted to a particular agency are secured, and the limited functions of review by the judiciary are more rationally exercised, by preliminary resort for ascertaining and interpreting the circumstances underlying legal issues to agencies that are better equipped than courts by specialization, by insight gained through experience, and by more flexible procedure.

*Far E. Conference v. United States*, 342 U.S. 570, 574–75, 72 S.Ct. 492, 96 L.Ed. 576 (1952).[13] Overall, the "doctrine seeks to produce better informed and uniform legal rulings by allowing courts to take advantage of an agency's specialized knowledge, expertise, and central position within the regulatory regime." *Pharm. Research & Mfrs. of Am. v. Walsh*, 538 U.S. 644, 673, 123 S.Ct. 1855, 155 L.Ed.2d 889 (2003) (Breyer, J., concurring) (citing *W. Pac. R.R. Co.*, 352 U.S. at 63–65, 77 S.Ct. 161). The relevant inquiry is

> whether a case raises "issues of fact not within the conventional experience of judges," but within the purview of an

agency's responsibilities; whether the "limited functions of review by the judiciary are more rationally exercised, by preliminary resort" to an agency "better equipped than courts" to resolve an issue in the first instance; or, in a word, whether preliminary reference of issues to the agency will promote that proper working relationship between court and agency that the primary jurisdiction doctrine seeks to facilitate.

*Id.* (quoting *Far E. Conference*, 342 U.S. at 574–75, 72 S.Ct. 492). The question in determining whether application of the doctrine is appropriate in every case, therefore, is "whether the reasons for the existence of the doctrine are present and whether the purposes it serves will be aided by its application in the particular litigation." *W. Pac. R.R. Co.*, 352 U.S. at 64, 77 S.Ct. 161.

■ "No fixed formula exists for applying the doctrine of primary jurisdiction." *W. Pac. R.R. Co.*, 352 U.S. at 64, 77 S.Ct. 161; *cf.* Louis L. Jaffe, *Primary Jurisdiction*, 77 HARV. L. REV. 1037, 1037 (1964) (noting that the "doctrine of primary jurisdiction cannot be stated in the form of a rule in terms either of its analytic structure or of its incidence"). While "[a]nalysis is on a case-by-case basis," *Gen. Elec.*, 817 F.2d at 1026, our inquiry has generally focused on four factors:

> (1) whether the question at issue is within the conventional experience of judges or whether it involves technical or policy considerations within

cause "primary jurisdiction is neither jurisdictional nor primary").

**13.** *See also Fulton Cogeneration Assocs.*, 84 F.3d at 97 ("In deciding whether to apply the primary jurisdiction doctrine to a given case, a court must take into account the need for uniform decisions and the specialized knowledge of the agency involved."); *Golden Hill*

*Paugussett Tribe of Indians*, 39 F.3d at 59 ("The primary jurisdiction doctrine serves two interests: consistency and uniformity in the regulation of an area which Congress has entrusted to a federal agency; and the resolution of technical questions of facts through the agency's specialized expertise, prior to judicial consideration of the legal claims.").

the agency's particular field of expertise;

(2) whether the question at issue is particularly within the agency's discretion;

(3) whether there exists a substantial danger of inconsistent rulings; and

(4) whether a prior application to the agency has been made.

See *Nat'l Commc'ns Ass'n, Inc. v. AT & T Co.*, 46 F.3d 220, 222 (2d Cir.1995). We have noted as well that "[t]he court must also balance the advantages of applying the doctrine against the ˙potential costs resulting from complications and delay in the administrative proceedings." *Id.* at 223 (citing *Ricci*, 409 U.S. at 321, 93 S.Ct. 573).

■■■ Tribune contends that the doctrine of primary jurisdiction required the district court to stay or dismiss Ellis's suit because "determinations surrounding whether a license should be divested and the conditions attached to licenses unquestionably are committed to the FCC." Tribune notes that "the risk of inconsistent rulings was all but certain and became an accomplished fact." Likewise, the FCC argues that "[n]ot only was this a subject particularly within the special expertise and discretion of the FCC, but, contrary to the [d]istrict [c]ourt's conclusion, there was a substantial danger of inconsistent rulings because this was an open proceeding before the agency in light of Tribune's pending request for further extension of the waiver." In response, Ellis argues that the district court properly applied this Circuit's four-factor test. Ellis also asserts

that "[c]onstant deference to administrative agencies would contravene Congress's intent in enacting this statute as well as impinge on the role of the judiciary." After reviewing the nature of the questions at issue, the scope of the agency's discretion, the risk of inconsistent rulings, and the existence of prior applications, we conclude that the four factors weigh heavily in favor of recognizing the FCC's primary jurisdiction and that, as a result, the district court erred in not referring this matter to the Commission.[14]

### A. *The Nature of the Agency's Expertise*

The district court's decision addresses several issues that are not "within the conventional experience of judges" but actually involve "technical or policy considerations within the agency's field of expertise." *Nat'l Commc'ns Ass'n, Inc.*, 46 F.3d at 222. Determining whether Tribune met the requirements of the FCC's 2001 and 2002 Orders by using its ˙"best efforts" to sell WTXX involves a highly factual inquiry. Weighing whether the benefits of allowing Tribune to continue to own both WTXX and *The Hartford Courant* against any potential costs of such common ownership is a technical policy decision. Indeed, as the FCC later pointed out in its 2005 Order, the pending matter involved questions of public policy that were "difficult and unique," *2005 Order*, 20 F.C.C.R. 8584 ¶ 4, including "questions surrounding the market conditions in the Hartford market and WTXX's relative competitive position, Tribune's efforts to sell the station, public interest factors sup-

---

**14.** We review *de novo* the district court's decision not to apply the primary jurisdiction doctrine. *See Nat'l Commc'ns Ass'n*, 46 F.3d at 222. "As a threshold matter, of course, a court must find that the agency has jurisdiction over the issue ˙presented." *Fulton Cogeneration Assocs.*, 84 F.3d at 97 (internal quota-

tion marks omitted). Ellis does not challenge the district court's determination that, at least at the time of the district court's decision, "the FCC ha[d] jurisdiction over the issue presented in this action." *Ellis*, 363 F.Supp.2d at 131.

porting an extension of the waiver, and whether Tribune's ownership of WTXX has preserved and improved service to viewers." Finally, electing the appropriate remedy (*e.g.*, the implications of immediate, as opposed to delayed, divestiture) if Tribune was not in compliance and was not entitled to a waiver is ultimately a policy determination. All of these decisions involve considerations clearly within the FCC's particular field of expertise and are thus best addressed in the first instance by that agency.

The FCC's consideration of a request for waiver of the cross-ownership rule usually implicates these technical and policy considerations. " 'The FCC may exercise its discretion to waive a rule where particular facts would make strict compliance inconsistent with the public interest.' " *New York & Pub. Serv. Comm'n of New York v. FCC*, 267 F.3d 91, 107 (2d Cir. 2001) (quoting *Ne. Cellular Tel. Co. v. FCC*, 897 F.2d 1164, 1166 (D.C.Cir.1990)). Indeed, both the 2001 and 2002 Orders demonstrate the "public interest" balancing that the FCC must undertake in contemplating a waiver request. In the 2001 Order, the Commission concluded that "[t]he temporary loss of diversity in the Hartford market" would be outweighed by "the benefits of permitting an orderly sale of media properties to a qualified buyer that will preserve these stations as media voices in the market." *2001 Order*, 16 F.C.C.R. at 15,048 ¶ 10. Similarly, in the 2002 Order, the Commission extended Tribune's temporary waiver because "the underlying rationale supporting the waiver continues to be supported by the public interest." *2002 Order*, 17 F.C.C.R. at 3245 ¶ 9.

The Commission's weighing of the "public interest" in considering a waiver request is thus similar to the type of "public interest" or "reasonableness" determina-

tions that the Supreme Court has emphasized require administrative—rather than judicial—review under the primary jurisdiction doctrine. Because "the public interest is not a simple fact, easily determined by courts," *Atchison, Topeka & Sante Fe Ry. v. Wichita Bd. of Trade*, 412 U.S. 800, 824, 93 S.Ct. 2367, 37 L.Ed.2d 350 (1973), "Congress has placed [these types of determinations] squarely in the hands of the Commission." *Consol. Rail Corp. v. Nat'l Ass'n of Recycling Indus., Inc.*, 449 U.S. 609, 612, 101 S.Ct. 775, 66 L.Ed.2d 776 (1981) (per curiam) (citing *Arrow Transp. Co. v. S. Ry. Co.*, 372 U.S. 658, 662–72, 83 S.Ct. 984, 10 L.Ed.2d 52 (1963)). "The responsibilities for assessing the wisdom of such policy choices and resolving the struggle between competing views of the public interest are not judicial ones: 'Our Constitution vests such responsibilities in the political branches.' " *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 866, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) (quoting *TVA v. Hill*, 437 U.S. 153, 195, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978)).

The district court erroneously believed that the question presented was "straightforward"—"whether Tribune is in compliance with the 2001 Order" because the FCC had "never indicated that there was any ambiguity to its order, that further fact-finding is necessary or that there are any technical questions remaining." *Ellis*, 363 F.Supp.2d at 131. If the only issue (as the district court suggests) was whether Tribune violated the FCC's 2001 Order, then further agency review might have been unnecessary. But here the district court's decision implicated at least two other determinations that did not involve straightforward issues. First, the district court prevented (or at least attempted to prevent) further FCC consideration of whether to extend Tribune's waiver. The regulation of licenses, including waiver ex-

tensions, is a well-established function of the Commission, especially where, as here, two temporary waivers had already been issued as consonant with the public interest. Second, the district court also chose a remedy and ordered Tribune to transfer WTXX's license "forthwith." [15] Because the election of a remedy is a matter for the FCC (not the district court) to determine, the district court's Order interfered with the FCC's authority, not only to determine whether a waiver is warranted, but also to decide the appropriate consequence of the waiver's expiration. It is clear that the district court addressed difficult issues of fact and policy that were inextricably intertwined with the public interest.[16]

## B. The Scope of the Agency's Discretion

The question at issue in both Tribune's permanent waiver request and the 2005 Order—namely, whether Tribune should receive an extension of the waiver of the

---

**15.** The district court seemed to assume that the FCC's 2001 Order was a divestiture order. In fact, it was not. The 2001 Order only mandated in relevant part that "Tribune is GRANTED a temporary six-month period within which to come into compliance with the television/newspaper cross-ownership rule." *2001 Order*, 16 F.C.C.R. at 15,048 ¶ 13. Likewise, the 2002 Order only determined that "Tribune's request for an additional six-month period, from the date of release of this order, within which to come into compliance with the newspaper/broadcast cross-ownership rule, Section 73.3555(d)(3), is GRANTED." *2002 Order*, 17 F.C.C.R. at 3246 ¶ 11. Neither order delineated a self-effectuating remedy when the waiver period expired.

**16.** *Tassy v. Brunswick Hospital Center, Inc.*, 296 F.3d 65 (2d Cir.2002), and *TCG New York, Inc. v. City of White Plains*, 305 F.3d 67 (2d Cir.2002), are readily distinguishable. In *Tassy*, we concluded that agency review under the primary jurisdiction doctrine was unnecessary because the factual dispute, a question of whether a doctor committed sexual harassment or other acts of non-medical misconduct, "[did] not invoke the particular expertise" of the relevant agency (the New York Public Health Council). 296 F.3d at 70. In *TCG New York*, we declined to dismiss the case on the basis of primary jurisdiction because we found that "it is significant that the parties in this case stipulated to the facts" and that "all of the issues here are questions of law." 305 F.3d at 74–75. The instant case, by contrast, involves disputed factual issues better addressed by the particular expertise of the agency. Indeed, Ellis and Tribune vigorously dispute several questions including whether an extension of the waiver is in the public interest and whether divestiture would

be an appropriate remedy for continuing noncompliance.

Moreover, although not cited by either of the parties or the FCC, *Connecticut v. EPA*, 656 F.2d 902 (2d Cir.1981), is also distinguishable from the instant case. There, the state of New York had received approval from the Environmental Protection Agency (EPA) to revise New York's state implementation plan (SIP) for air pollution in order to conduct a "test burn" of sulfur oil *Id.* at 904. The states of Connecticut and New Jersey opposed this revision and filed a petition with the EPA under § 126(b) of the Clean Air Act, 42 U.S.C. § 7426(b), which "provides that any state may petition the EPA Administrator for a finding that a pollution source in another state violates the Act's interstate pollution provisions." *Id.* The agency took no action with reference to the § 126(b) petitions, and Connecticut and New Jersey filed a joint petition for review of the EPA's final order approving New York's SIP. On appeal, we rejected intervenor New York State's primary jurisdiction argument that "this [C]ourt lacks jurisdiction to review EPA's approvals of the SIP revision inasmuch as the § 126(b) petitions are still pending." *Id.* at 905. We relied on the fact that "[t]here is absolutely no authority to the effect that exhaustion of the § 126(b) procedure is a condition precedent to a judicial review of an EPA approval of an SIP revision." *Id.* The procedural posture of the instant case, by contrast, does not present for our review any "final administrative action" analogous to the EPA's approval of an SIP revision. *Id.* Although the FCC previously issued two temporary waivers, the FCC had neither granted nor denied Tribune's permanent waiver request at the time of the district court's decision.

cross-ownership rule—is particularly within the agency's discretion. The FCC's exercise of its licensing authority " 'is a task that Congress has delegated to the Commission in the first instance' . . . with deferential judicial review reserved to the courts of appeals." *In re NextWave Pers. Commc'ns, Inc.*, 200 F.3d 43, 55 (2d Cir. 1999) (per curiam) ("*In re NextWave*") (quoting *FCC v. WNCN Listeners Guild,* 450 U.S. 582, 596, 101 S.Ct. 1266, 67 L.Ed.2d 521 (1981)). The FCC is "expected to serve as the single Government agency with unified jurisdiction and regulatory power over all forms of electrical communication, whether by telephone, telegraph, cable, or radio." *United States v. Southwestern Cable Co.*, 392 U.S. 157, 168, 88 S.Ct. 1994, 20 L.Ed.2d 1001 (1968) (internal quotation marks and footnote omitted); *see also In re Long Distance Telecomms. Litig.*, 831 F.2d 627, 630 (6th Cir.1987) (affirming district court decision that granted FCC primary jurisdiction and that "considered the pervasive nature of the FCC's regulatory authority over the communications industry").

Indeed, "[i]n the Communications Act of 1934, 48 Stat. 1064, as amended, Congress assigned to [the Commission] *exclusive authority* to grant licenses, based on 'public convenience, interest, or necessity,' to persons wishing to construct and operate radio and television broadcast stations in the United States." *Metro Broad., Inc. v. FCC,* 497 U.S. 547, 553, 110 S.Ct. 2997, 111 L.Ed.2d 445 (1990) (emphasis added), *overruled on other grounds by Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995).

> [T]he Commission shall determine, in the case of each application filed with it . . ., whether the public interest, convenience, and necessity will be served by the granting of such application, and, if the Commission, upon examination of such application and upon consideration of such other matters as the Commission may officially notice, shall find that public interest, convenience, and necessity would be served by the granting thereof, it shall grant such application.

47 U.S.C. § 309(a). Moreover, as we have held, the FCC's "exclusive jurisdiction" extends "not only to the granting of licenses," but also "to the conditions that may be placed on their use." *In re NextWave*, 200 F.3d at 54.

*In re NextWave* is instructive in understanding the scope of the FCC's discretion (as well as the limited role of the courts) in licensing matters. In *In re NextWave*, the district court affirmed a bankruptcy court's decision that permitted NextWave to avoid $3.7 billion of its $4.74 billion obligation to the FCC and to allow NextWave to keep sixty-three radio licenses while it reorganized in bankruptcy. *See In re NextWave Pers. Commc'ns, Inc. v. FCC*, 241 B.R. 311, 315–16 (S.D.N.Y.1999). On appeal, we held that the district court and bankruptcy court exceeded their jurisdiction by, in effect, intervening in the allocation of radio spectrum licenses, a matter within the FCC's exclusive regulatory jurisdiction. *In re NextWave*, 200 F.3d at 54–56. We noted that "[i]t is beyond the jurisdiction of a court in a collateral proceeding to mandate that a licensee be allowed to keep its license despite its failure to meet the conditions to which the license is subject." *Id.* at 54. We concluded that, "[i]n order for Congress's prescribed regulatory system to function properly in a dynamic environment, the FCC's allocative decisions must not be interfered with by other instrumentalities of the federal government acting beyond their statutory authority." *Id.* at 55–56. We emphasized that "[w]hen the FCC decides which entities are entitled to spectrum licenses under rules and conditions it has promulgated, it therefore exer-

cises *the full extent of its regulatory capacity." Id.* at 54 (emphasis added).

Logically, the Commission retains exclusive authority to grant waiver requests from its licensing requirements. In enacting the regulations prohibiting cross-ownership, the Commission noted "its expectation that there could be meritorious waiver requests." *In the Matter of Newspaper/Radio Cross–Ownership Waiver Policy,* 11 F.C.C.R. 13,003, 13,004 ¶ 3 (1996) ("*Cross–Ownership Waiver Policy*") (citing *1975 Amendment,* 50 F.C.C.2d at 1075). Accordingly, the Commission set forth four non-exclusive bases that it would consider in reviewing such requests.[17] *See 1975 Amendment,* 50 F.C.C.2d at 1084–85. The Supreme Court, in upholding the cross-ownership rule, "specifically noted the availability of waivers of the rule, particularly where the station and newspaper could not survive under separate ownership, as underscoring the reasonableness of the rule." *Id.* (citing *FCC v. Nat'l Citizens Comm. for Broad.,* 436 U.S. 775, 98 S.Ct. 2096, 56 L.Ed.2d 697 (1978)). Indeed, the United States Court of Appeals for the District of Columbia recently held that a "Commission's 'waiver decision' was inextricably tied to its 'licensing decision.'" *N. Am. Catholic Educ. Programming Found., Inc. v. FCC,* 437 F.3d 1206, 1210 (D.C.Cir.2006). Overall, therefore, it is well established that the FCC's ability to grant waivers is a fundamental component of its licensing discretion.

## C. The Risk of Inconsistent Rulings

Because Tribune's application for an extended waiver was still pending before the Commission at the time of the district court's decision, there existed a "substantial danger of inconsistent rulings." *Nat'l Commc'ns Ass'n,* 46 F.3d at 222. As the district court must have been aware, Tribune's timely application for a waiver extension (although not addressed in a timely manner by the FCC) obviously raised the possibility that the FCC might take further administrative action and grant a permanent or temporary waiver extending Tribune's compliance period. Inconsistent rulings did occur in this case in part because the district court failed to defer to the FCC's exclusive authority to address this matter in the first instance. *See Atchison, Topeka & Santa Fe Ry.,* 412 U.S. at 821, 93 S.Ct. 2367 (emphasizing that "the issuance of an injunction pending further administrative action" is "precisely what the doctrine of primary jurisdiction is designed to avoid"); *cf. Metrophones Telecomms., Inc. v. Global Crossing Telecomms., Inc.,* 423 F.3d 1056, 1079 (9th Cir.2005) (noting that there should be "little danger of inconsistent administration of

---

**17.** In analyzing whether to revise its cross-ownership waiver policy, the FCC discussed the four bases for waiver that it had previously articulated in its *1975 Amendment:*

First, the Commission stated that inability to sell the station would constitute a basis for a waiver. Refusal to grant a waiver under such conditions would work a forfeiture, a result contrary to the Commission's intent. Second, the Commission stated that it would waive the rule upon a showing that the only sale possible would be at an artificially depressed price. Third, the Commission contemplated waiving the rule if it could be shown that the separate ownership and operation of the newspaper and the broadcast station could not be supported in the locality. Finally, the Commission indicated that it would waive the rule if it could be shown, for whatever reason, that the purposes of the rule would be disserved by its application. In this regard, the Commission stated that while it would consider the specifics of any particular situation, it would not relitigate in the guise of a waiver request issues that it had previously considered and rejected in adopting the rule.

*Cross–Ownership Waiver Policy,* 11 F.C.C.R. at 13,004–05 ¶ 3, 1996 WL 557332 (1996) (footnotes omitted).

federal policy" because "any policy issues that do arise can be referred to the Commission under the doctrine of primary jurisdiction").

Courts should be especially solicitous in deferring to agencies that are simultaneously contemplating the same issues. Because an agency "is currently conducting an investigation into the lawfulness of the [practice] under attack," "to permit the court below initially to determine [the issue] would invite the very disruption ... that the doctrine is meant to discourage." *Danna v. Air France,* 463 F.2d 407, 412 (2d Cir.1972). Indeed, in the context of the Interstate Commerce Commission (ICC), the Supreme Court has made clear that district courts should not issue injunctive relief while a decision over which the Commission has exclusive authority is pending. *See, e.g., United States v. Students Challenging Regulatory Agency Procedures,* 412 U.S. 669, 690–99, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973) (relying on *Arrow Transportation Co.,* 372 U.S. 658, 83 S.Ct. 984, 10 L.Ed.2d 52, to conclude that the district court lacked jurisdiction to enter injunction); *cf. Atchison, Topeka & Sante Fe Ry.,* 412 U.S. at 821, 93 S.Ct. 2367 ("The fact that issuing an injunction may undercut the policies served by the doctrine of primary jurisdiction is therefore an important element to be considered when a federal court contemplates such action."). In the same manner, district courts should refrain from addressing the necessity (or lack thereof) of extending a waiver request or from formulating a remedy such as divestiture, where, as here, the issues were currently pending before the FCC. *See, e.g., Mical Commc'ns, Inc. v.*

*Sprint Telemedia, Inc.,* 1 F.3d 1031, 1033, 1040 (10th Cir.1993) (noting that, because the "precise issue is pending before the FCC now," there exists a "real possibility that a decision by this court prior to the FCC's response ... would result in conflicting decisions").

The district court, noting that "this action is focused on the particular situation faced by Tribune in Connecticut" and that the FCC's Order would be "limited to Tribune's situation," erroneously concluded that "there is no substantial danger of inconsistent rulings." *Ellis,* 363 F.Supp.2d at 131. The district court seemed to assume that the danger of inconsistent judgments is only problematic in a potential conflict between *different* cases. In fact, while conflicting results in separate cases are a common concern, conflicts arising within the *same* case are especially problematic. "Conflicts of doctrine and policy, particularly between unrelated cases, are bearable up to a point and would in many cases be finally reconcilable by the Supreme Court. More troublesome is a situation ... where the same parties are the subject of conflicting decisions." Jaffe, *supra,* at 1052. Indeed, in this case, the "substantial danger of inconsistent rulings" became a reality upon the FCC's issuance of its 2005 Order. While the district court ordered an immediate sale of WTXX's license, the FCC declared in its 2005 Order that Tribune's continued ownership of WTXX (at least until early 2007) was within the public interest. Such a conflict within the "law of the case" is precisely the type of problem that the primary jurisdiction doctrine is meant to avoid.[18]

18. Ellis contends that there was no substantial danger of inconsistent rulings because the FCC had no authority to issue its 2005 Order. According to this argument, the district court would (and should) have had no concern

about inconsistent judgments when it granted summary judgment for Ellis because the court would (and should) have assumed that the FCC had no authority to contradict its decision. However, Ellis confuses the timing of

■ We emphasize, however, that our analysis in no way undermines the finality of administrative proceedings. When an agency is barred by regulation or statute from ruling on a matter for whatever reason, we must respect the limitation on the agency's authority and will not apply the doctrine of primary jurisdiction. When an agency is barred from further review, there is no prospective danger of inconsistent rulings within the law of the case.

## D. *Prior Application to the Agency*

The district court erred in concluding that the final factor—prior application to the agency—weighed against primary jurisdiction. The district court's entire analysis as to this factor consisted of noting that "Tribune clearly has made prior applications to the FCC." *Ellis* 363 F.Supp.2d at 131. Both the district court and *Ellis* seem to misinterpret the point of this inquiry, which requires us to consider whether prior application to the agency has been made. If prior application to the agency is present, this factor provides support for the conclusion that the doctrine of primary jurisdiction is appropriate. *See Oasis Petroleum Corp. v. U.S. Dep't of Energy*, 718 F.2d 1558, 1566

(Temp.Emer.Ct.App.1983). On the other hand, if prior application to the agency is absent, this factor may weigh against referral of the matter to the agency on the basis of primary jurisdiction. *See Nat'l Commc'ns Ass'n*, 46 F.3d at 222 (noting the district court's determination that, because "no prior application had been made to the FCC," this "factor[ ] did not favor referral to the FCC"); *U.S. ex rel. Taylor v. Gabelli*, 345 F.Supp.2d 340, 357 (S.D.N.Y.2004) (holding that the prior application factor "disfavors referral" because "no prior application to the FCC has been made"). Here, Tribune made prior applications to the FCC in the form of its waiver requests in June of 2000 (temporary waiver subsequently granted in 2001 Order) and February of 2002 (temporary waiver subsequently granted in 2002 Order), as well as its permanent waiver request in August of 2002 (temporary waiver subsequently granted in 2005 Order). The fact that all three of these "prior applications to the agency had already been made in this matter" provides "further support [for] our conclusion that the doctrine of primary jurisdiction should have been invoked by the district court." *Oasis Petroleum Corp.*, 718 F.2d at 1566.

---

the relevant inquiry. Evaluating the danger of inconsistent rulings is an inquiry that the district court undertakes *before* issuing an injunction or ordering other relief. As a result, a party cannot immunize itself from the primary jurisdiction doctrine by claiming that there was no possibility of inconsistent rulings *after* the district court's decision (even if that decision would have revoked the subsequent jurisdiction of the agency—an issue we need not decide).

However, we agree with the district court insofar as it gave little weight to the FCC Media Bureau's 2003 Letter, *see supra* notes 6 and 8, in analyzing the agency's primary jurisdiction. The parties vigorously dispute the appropriate weight that should be given to the 2003 Letter. While we need not determine the 2003 Letter's ultimate import in deciding this case or in recognizing the substantial

danger of inconsistent rulings, we note that the 2003 Letter's legal effect is most likely insignificant given that the FCC itself subsequently denounced this practice. *See 2005 Order*, 20 F.C.C.R. at 8589–90 ¶ 21, 2005 WL 857000 (noting that, although the Media Bureau sent Tribune a letter in which it commented on Tribune's compliance, "[i]n the future, we expect that the Commission will make determinations concerning the compliance or noncompliance of licensees with the terms and conditions of waivers granted by the Commission"). At most, the 2003 Letter could have served as some evidence to the district court that the Commission was still considering Tribune's permanent waiver request and that the FCC may have eventually arrived at a conclusion that was inconsistent with the district court's decision.

Ellis argues that it would have been unrealistic for him to apply to the FCC because the agency was "hostile" to him and to the public interest. This Court has recognized that "where resort to the agency would plainly be unavailing in light of its manifest opposition or because it has already evinced its 'special competence' in a manner hostile to petitioner, courts need not bow to the primary jurisdiction of the administrative body." *Bd. of Educ. of the City of New York v. Harris*, 622 F.2d 599, 607 (2d Cir.1979). As an initial matter, however, we note once again that the party seeking agency review, Tribune, had already made three prior applications to the agency. In any event, Ellis never afforded the Commission an opportunity to address his claims at any time throughout these proceedings. As Tribune points out, Ellis could have, but did not (i) seek the FCC's interpretation or enforcement of the 2001 and/or 2002 Orders; (ii) oppose Tribune's petition for a permanent or further temporary waiver, or (iii) request a stay, reconsideration or review of the 2005 Order. Instead, Ellis brought this action directly in the district court under 47 U.S.C. § 401(b). On this record, Ellis is unable to show that the FCC was hostile to him within any agency proceeding or with regard to the merits of Tribune's permanent waiver request, and the FCC's opposition to Ellis's attempt to file an enforcement action in federal district court does not demonstrate that a direct appeal to the FCC would have been futile.

\* \* \*

■ Finally, in analyzing the potential advantages of applying the doctrine against the potential costs, we recognize that, because primary jurisdiction is a mechanism for streamlining judicial re-

view, courts (including this Court) have sometimes refused to recognize a primary jurisdiction claim where agency referral would result in undue delay. *See, e.g., Nat'l Commc'ns. Ass'n*, 46 F.3d at 225 (holding that, "[s]ince the district court can conclude this matter far more expeditiously, a potential delay of even two years more than outweighs any benefit that might be achieved by having the FCC resolve this relatively simple factual dispute"). However, more recently, we have noted that such considerations of judicial economy should not be considered because "the Supreme Court has consistently held that there are only two purposes to consider in determining whether to apply the primary jurisdiction doctrine—uniformity and expertise" and "the Supreme Court has never identified judicial economy as a relevant factor." *Tassy v. Brunswick Hosp. Ctr., Inc.*, 296 F.3d 65, 68 n. 2 (2d Cir.2002). *But see Tassy*, 296 F.3d at 75 (Walker, C.J., dissenting) (pointing out that this Court has relied on the judicial economy factor in *Johnson v. Nyack Hosp.*, 964 F.2d 116, 123 (2d Cir.1992), and that, in any event, "considerations of judicial economy overlap to a certain extent with those of agency expertise"); *cf. Reiter v. Cooper*, 507 U.S. 258, 270, 113 S.Ct. 1213, 122 L.Ed.2d 604 (1993) (noting that "referral of the unreasonable-rate issue" to the ICC "could produce substantial delay"). Here, even assuming that judicial economy could be considered (as an aspect of agency expertise or otherwise), we do not believe that the possibility of additional agency delay would have counseled against primary jurisdiction because this case, unlike *National Communications Association*, involves highly complicated factual and policy disputes that the FCC is uniquely well-situated to address.[19]

---

19. We also disagree with the district court's apparent suggestion that the FCC's failure to

make a motion to intervene or otherwise participate in this litigation prevents the applica-

The district court suggested, and Ellis continues to argue, that the statutory grant of enforcement power under 47 U.S.C. § 401(b) would be "eviscerated if district courts always had to defer to the jurisdiction of administrative agencies." *Ellis*, 363 F.Supp.2d at 131. We agree that deference in all circumstances would eviscerate the district court's jurisdiction under § 401(b), but, contrary to the district court, we do not believe that Tribune (or the Commission) has suggested such an absolute rule. Indeed, in *Goya Foods, Inc. v. Tropicana Products, Inc.*, 846 F.2d 848 (2d Cir.1988), we suggested that the scope of the primary jurisdiction doctrine—at least in certain contexts such as federal trademark registration—is "relatively narrow" and that the doctrine applies only "when the issue involves technical questions of fact uniquely within the expertise

and experience of an agency." *Id.* at 851 (internal quotation marks omitted). District courts should continue to apply this Court's four-factor test, *see Nat'l Commc'ns Ass'n, Inc.*, 46 F.3d at 222, because each case turns on "whether the reasons for the existence of the doctrine are present and whether the purposes it serves will be aided by its application in the particular litigation." *Western Pac. R.R. Co.*, 352 U.S. at 64, 77 S.Ct. 161. In holding here that the district court should have referred this matter to the FCC under the doctrine of primary jurisdiction, we by no means suggest that primary jurisdiction is mandatory whenever the jurisdictions of a court and agency overlap.[20]

While the primary jurisdiction doctrine guards against the "hazard of forbidden judicial intrusion into the administrative domain," *Arrow Transp. Co.*, 372 U.S. at

---

tion of the primary jurisdiction doctrine. *See Ellis*, 363 F.Supp.2d at 131–32. The primary jurisdiction doctrine does not require the agency's participation in a matter before the doctrine can be raised by a party or even by the court itself. *See Syntek Semiconductor Co., Ltd. v. Microchip Tech., Inc.*, 307 F.3d 775, 780 n. 2 (9th Cir.2002). Neither of the cases cited by the district court are to the contrary. In *Hawaiian Telephone Co. v. Public Utilities Commission of Hawaii*, 827 F.2d 1264, 1272 (9th Cir.1987), and *South Central Bell Telephone v. Louisiana Public Service Commission*, 744 F.2d 1107, 1118 (5th Cir. 1984), *vacated by Louisiana Public Service Commission v. South Central Bell Telephone Co.*, 476 U.S. 1166, 106 S.Ct. 2884, 90 L.Ed.2d 972 (1986), the Ninth and Fifth Circuits respectively suggested the possibility of the FCC's intervening or filing an amicus brief in § 401(b) actions only to facilitate (and not as a prerequisite of) the district court's analysis of primary jurisdiction. In this case, the FCC did participate as a friend of the court at the appellate stage. In any event, Tribune has argued for dismissal on the basis of primary jurisdiction since its original motion to dismiss, *see Ellis*, 363 F.Supp.2d at 130–32, and thus, its claim is preserved.

**20.** We also reject Ellis's argument that "[t]he case for refusing to apply the primary juris-

diction doctrine is further strengthened by the statutory grant of authority encapsulated in 47 U.S.C. § 401(b)." We agree that "[i]t is inappropriate to invoke the doctrine of primary jurisdiction in a case in which Congress, by statute, has decided that the courts should consider the issue in the first instance." *United States v. McDonnell Douglas Corp.*, 751 F.2d 220, 224 (8th Cir.1984) (citing *Mississippi Power & Light Co. v. United Gas Pipe Line Co.*, 532 F.2d 412, 419 (5th Cir.1976)). Here, however, while Congress has decided that district courts may "enforce" final FCC orders under § 401(b), Congress has not given courts the authority either to make public interest determinations regarding licenses in general or waivers in particular or to devise appropriate remedies for non-compliance with agency regulations. *Cf. Allnet Commc'n Serv., Inc. v. Nat'l Exch. Carrier Assoc., Inc.*, 965 F.2d 1118, 1122 (D.C.Cir.1992) (concluding, under an analogous enforcement provision of the Communications Act, that the provision "says only that injured parties may institute collection suits in district court; it does not prohibit the court from withholding decision until the Commission has spoken on technical or policy questions that would determine the outcome").

670, 83 S.Ct. 984, the doctrine also relies on the timely and good-faith efforts of regulatory agencies in addressing issues within their domain. *Cf. Golden Hill Paugussett Tribe of Indians*, 39 F.3d at 60 (admonishing agency not to address issue "in a leisurely manner when, under the circumstances, it should be on a 'fast-track' instead"). As the FCC stated in its 2005 Order: "We also do not intend to continue the practice of allowing waivers to remain in force through inaction for long periods of time. Rather, we expect to address compliance with the terms of waivers as their expiration dates approach." [21] 2005 FCC Order, ¶ 21. We sincerely hope that in the future the FCC will complete its work in a timely manner so as to avoid the type of situation that arose in this case.

Overall, however, the district court should have invoked the primary jurisdiction doctrine and allowed the FCC to address this licensing matter in the first instance. Such an approach would have avoided the subsequent inconsistent rulings and allowed the FCC to exercise its expertise and discretion in deciding Tribune's waiver request. *See United States v. Morgan*, 307 U.S. 183, 191, 59 S.Ct. 795, 83 L.Ed. 1211 (1939). "A federal agency and a district court are not like two trains, wholly unrelated to one another, racing down parallel tracks towards the same end.... [I]t is desirable that the agency and the court go down the same track—although at different times—to attain the statute's ends by their coordinate action." *Golden Hill Paugussett Tribe of Indians*, 39 F.3d at 59.

### CONCLUSION

The district court erred in failing to recognize the FCC's primary jurisdiction in this matter. Where a district court fails to recognize an agency's primary jurisdiction, we may instruct the district court to hold further proceedings in abeyance pending referral to the agency rather than to dismiss an action. *See, e.g., Southwestern Sugar & Molasses Co., Inc. v. River Terminals Corp.*, 360 U.S. 411, 421–22, 79 S.Ct. 1210, 3 L.Ed.2d 1334 (1959). However, while the district court's retaining jurisdiction may have been a conceivable option prior to the FCC's 2005 Order, we agree with the FCC that there is no longer any useful purpose that would be served by remanding the case to the district court with directions to refer the case to the FCC. *See Far E. Conference*, 342 U.S. at 576–77, 72 S.Ct. 492. The FCC's 2005 Order extending Tribune's waiver until

---

**21.** Two Commissioners, raising similar concerns about the frequency and consequences of the FCC's inaction on waiver requests, pointed out in an opinion concurring in the 2005 Order:

[C]ompanies routinely file requests to extend waivers and the Commission too often fails to either address those requests or to enforce its rules once a waiver has lapsed. This has been an unconscionable abdication of responsibility that does nothing to provide predictability and certainty, [let] alone to safeguard the public interest. The Commission has allowed companies to avoid compliance with our rules and to hold licenses—sometimes for years—in the hope that our media concentration protections will one day be loosened and these waivered deals can then be made permanent....

How much better it would be if the Commission would address pending waiver requests in a timely manner, evaluate whether such waivers indeed serve the public interest, and then enforce its ownership rules. In the present case, the Commission finally approaches meeting this responsibility, albeit two and a half years after the waiver technically expired.

*2005 Order*, 20 F.C.C.R. at 8591 (Copps & Adelstein, Commissioners, concurring).

early 2007 has addressed and resolved the issues that the district court should have referred to the FCC under the primary jurisdiction doctrine. Accordingly, we VACATE the district court's judgment and REMAND the case to the district court with directions to dismiss.